**CLARK et ux. v. UNITED STATES and nineteen other cases.**

**Civ. No. 4420.**

United States District Court
D. Oregon.

Sept. 8, 1952.

See also 109 F.Supp. 213.

by the United States. The location was entirely surrounded by embankments and was washed on three sides by the floodwaters of the Columbia River. On May 30, 1948, the river, then at a flood height of 29.6 above mean high water, broke through an embankment and flooded the city, which had a population at that time of some sixteen thousand inhabitants, approximately. Much personal property was destroyed by the action of the water, as were most of the erections by the government on the site. Subsequently, seven hundred twelve actions for property damage, comprising some three thousand claims, were filed against the United States for loss and damage to this property under the terms of the Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671–2680. The amounts involved ran to several million dollars. The regular routines prescribed by the Tort Claims Act were followed. The government attorneys filed dilatory motions, but these were all reserved by the Court until the time of the pre-trial conference. Under the direction of the Court, answers were filed to each of the complaints. With the consent of all parties, however, time was allowed to lapse until the Statute of Limitations had run on all claims. Since Congress once extended time of limitation, considerable time elapsed before the cases were in a situation to be submitted, even for preliminary action.

[1] Since extremely complicated issues of law were involved as to liability, and if there were liability, enormous detail of fact in settling damages, the Court conceived of this as the big case in which pre-trial conferences should be held and a definitive pre-trial order drawn. These conferences were held in open court with a reporter. A pre-trial order was drafted in tentative form and discussed at several hearings in open court in the presence of great numbers of the plaintiffs. As has been noted before, this procedure accords with the theory of the Court that the litigants themselves should be present in order that they may see and hear what disposition is made of their rights. Eventually, the attorneys arrived at complete agreement. During the

Raymond G. Brown, Solon B. Clark, A. C. Allen, Irving Rand and Gerald J. Meindl, Portland, Or., for plaintiffs.

Henry L. Hess, U. S. Atty., Portland, Or., and Walker Lowry, Special Asst. to the Atty. Gen., for the United States.

JAMES ALGER FEE, Chief Judge.

The United States, in order to house wartime workers in the Kaiser Shipyards, condemned land situated in the Peninsula Drainage District and therein erected the City of Vanport, which was wholly owned

course of the conferences, certain parties plaintiff and the government representatives selected twenty cases of the entire group for trial. All of these cases were concerned with property damage. Thereupon, by the consent of the parties and the attorneys in the selected group of cases at a final pre-trial conference, there was submitted a final definitive pre-trial order applicable in the selected group of cases. The Court thereupon signed and approved this pre-trial order.

In order that there might be a complete submission upon the question of liability, the Court thereupon directed that all of the plaintiffs in other cases should either draw and submit to the Court a proposed definitive pre-trial order covering liability in his particular case or should agree of record to accept the issues as to liability set out in the pre-trial order covering the twenty cases which were to be tried. Otherwise, if neither of these two alternatives were chosen, the plaintiff in that particular case would be defaulted and the case dismissed for want of prosecution.

The case then came on for trial upon the selected causes upon the issues of liability alone. Thereafter, briefs were submitted in elaborate form by plaintiffs and defendants. After a review of these briefs, the Court ordered an oral argument which covered the whole field of liability. Upon the eve of decision, the Court has again reviewed the definitive pre-trial order in the light of the testimony and the arguments. The Court now gives final approval to the pre-trial order as embracing all the issues of fact and law in the case.

■ This final review is frankly given in order to avoid the force of Rule 15(b), Fed.Rules Civ.Proc. 28 U.S.C.A., which reads:

"Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues."

There is authority to the effect that an appellate court may thus try issues which neither the trial judge nor the attorneys nor the parties may have thought were involved in the case. In order to avoid such a misconception, the Court now finds that the issues set out in the pre-trial order were the only ones tried, whether of fact or of law. If someone hereafter conceives that other issues were tried, the proper result would be to send the case back for the trial of those issues rather than assuming that such issues were tried.

■ The order which is hereinafter set forth is drawn by the attorneys. The Court has confined itself largely to making suggestions so that all of the issues should be covered. The definitive order is, of course, a consolidated pleading, and traditionally the pleadings have been drawn by the attorneys for the parties rather than by the Court. The function of the legal profession is thus to protect their clients by so drafting the issues that the interests which they are hired to maintain can properly be stated. The pre-trial order in this case is ably and accurately drawn. It is in four parts, as follows: first, a detailed statement of the facts upon which the parties could agree; second, a statement of the contentions of the parties as to fact and as to law; third, the statement of the issues of fact and the issues of law as agreed upon between the attorneys; and fourth, a list of all the documents which either party believed he might introduce in his own case.

The first of these sections is very important. There the parties have agreed to a narrative in story form as to a great many facts which are salient and pertinent in the dispute but about which there could be no disagreement. It is true that a great deal of this material could have been placed in the background of the litigation by assertions and denials of fact, but such a tremendous amount of it is evidentiary in character

that this would not have served the purposes. Here the background for the action in the controversy is laid. By such a thorough-going review of all the facts which are not in issue and over which there is no controversy, the contested issues are brought sharply into the foreground. It may be, of course, that, under the issues, considerable of this material is irrelevant and immaterial, but nevertheless it gives color to the contested issues by building up these dikes of uncontested facts. The flow of the action is canalized and kept within bounds.

■ In the second phase of the order, the parties by succinct statement set up their theories of recovery and of defense. This is an extremely important function of the pre-trial order. The doctrine that there has to be a theory of the pleadings has been much criticized in the past. But, obviously enough, no lawyer can go into the trial of the case unless he has some theory of substantive law upon which he bases his right to recover. If it is improper to deduce this from the language of the pleading, it certainly is not improper for the party to set it out and be bound by his theories of recovery. If it is impossible for him to state a theory of recovery, then it might well be concluded that no such theory exists. It is unquestionably improper for the matter to lie at large and permit some court, whether trial or appellate, to pick the theory upon which the facts of the case should be decided, perhaps to the injustice of a litigant. Nor should either trial or appellate court assume that they are omniscient as to the causes of action which are set out by a complaint and that they may disregard the counsel's own theories of recovery.

When a plaintiff has by his counsel advised the Court and defendant of the theories upon which he relies and has given account of these, then the Court should not adopt some other theory of recovery, even if it should be believed that such a theory was more applicable. The other side has also a right to rely upon the theory stated by the counsel for the plaintiff, and it is entire injustice to require the defendant to accept some theory of law propounded by the Court for the first time in the opinion. Likewise, the defense in these cases very carefully sets up theories of defense. Here also the same considerations prevail. The defendant should be bound by such theories as well as the plaintiff, and the Court should not find some other ground on which to deflect the attack. If it should be believed either by the trial judge or the appellate judges that the theories are incorrect and do not fit the facts, then the case should be remanded for the purpose of drafting a new pre-trial order and these things should then be set forth. In this instance, it is believed that the pre-trial order covers very exactly both the theory of recovery and the theories of defense.

The issues of fact are then stated. Here there is a distinct working in and interweaving of the previous portions of the order. The background of fact, as given in the story recital of agreed facts, eliminates many possible contentions and issues of fact which otherwise would be required to be tried. On the other hand, the theories of recovery and defense announced in the previous section also limit the field because a great many facts and circumstances which otherwise might necessarily have to be determined are eliminated by the theories of law which render them irrelevant, incompetent and immaterial. To the issues of fact here set out, the Court can give categorical answers in most instances. Such answers will form the basis for the findings of fact. So a foundation for the judgment is laid by three steps. First, the statement of the agreed facts; second, a finding upon material contested facts; and third, under the law, the sentence or pronouncement of consequences which follows legally set forth in the judgment.

■ Another phase of this same section of the pre-trial order deals with the issues of law. Here again, this feature of the order must be consistent with the prior sections. In other words, the agreed facts must be vitalized by a theory of law in order to highlight the contested facts, and in this order, as in a great many other orders,

it will be discovered that one or the other party believes that certain of the agreed issues of fact are immaterial to either the recovery or the defense. It is true that probably, in the first instance, all issues of law cannot be stated in a pre-trial order because the course of trial will bring up many new problems which cannot prior to that time be anticipated. The method of curing this, however, is to amend the pre-trial order whenever it is conceived that manifest injustice results from leaving it as originally written.

Finally, we come to the documents which are listed by each party as pre-trial exhibits. This section saves a great deal of time for the Court because, as the documents are listed and numbered, this serves for the identification number which was formerly necessary to be given by the reporter or the clerk during the course of the trial. In this jurisdiction, it is the informal custom of the Court that all documents to which one side desires to refer in his proof or to use in any manner should be identified in the pre-trial order. It is true often, as in this case, that a great many of such documents are never introduced at the trial because one side or the other determines that the course of the evidence is such that the exhibit is not needed or that it does not prove what he wishes. However, the documents do serve to lay the background of the agreed statement of facts as well as other features of the pre-trial order. The cardinal importance of documents in modern litigation is thus emphasized.

The Court, of course, made no inquiry as to where these documents came from. They may have been in the files of the parties themselves. On the other hand, they may have been obtained from extraneous sources. Or finally, they may have been obtained by demand under the rules or by production in accordance with demand of the Court upon deposition.

■ The final phase of the pre-trial order is the conclusion, wherein it is stated that the pleadings have now passed out of the case. This is done for the express purpose of requiring the appellate courts to rule upon the exact issues which were presented to the trial court and not to write essays about something else. The technicalities of the pleadings, which are usually raised in the appellate courts, constitute second thoughts upon the part of counsel, and very often serious injustice is done thereby. In this case, however, the United States has asked that the Court rule upon the sufficiency of the complaint. There is no reason why this should not be done if it makes counsel happier to have the technical matter ruled upon in this way. It may be well said, however, that, since the pre-trial order includes all of the issues of fact and law in the litigation, if it is not set out in the pre-trial order, the pleadings will do no good, even though it might be possible for some other court to interpret them otherwise. In order that the pre-trial order may be understood and the comments and criticisms thereof above set out may be apprehended, the essential portions of the pre-trial order, without unnecessary repetition, are set out below.

### Pre-Trial Order.

A pre-trial conference was held in this and related cases on the 6th day of August, 1951, the Honorable JAMES ALGER FEE presiding.

Now, Therefore:

A. The parties have agreed and it is hereby ordered that the cases listed in Schedule "A" attached to this order shall be and they are hereby consolidated with this case. The consolidated cases all relate to claims for property damage at Vanport, Oregon, arising out of the 1948 Columbia River flood. The consolidated cases have been selected by counsel from more than seven hundred cases now on file in this Court in which claims totaling between six and seven million dollars are asserted against the United States on account of damage alleged to have been caused by the 1948 Columbia River flood.

B. The parties have agreed and it is hereby ordered that the trial and determination of the amount, if any, of the damage

suffered by the plaintiffs in the consolidated cases shall be postponed until after there has been a trial court determination of whether or not the United States is liable to the plaintiffs for that damage, if any.

C. For purposes of the decision and disposition of these consolidated cases but for no other purpose the parties agree as follows:

### Agreed Facts

1. *The Columbia River.* The Columbia River has its source in Columbia Lake, British Columbia, 75 miles north of the international boundary. From its source the river flows northwesterly for a distance of 200 miles; it then turns and flows almost due south a distance of 260 miles to enter the United States near the northeast border of the State of Washington. From the international boundary to a point 15 miles below the mouth of the Snake River, a distance of 441 miles, the river flows in a southerly direction through the eastern part of the State of Washington; it then turns and flows westward a distance of 309 miles, forming the boundary between Oregon and Washington, to discharge into the Pacific Ocean at a point 160 miles south of the Straits of Juan de Fuca and 610 miles north of San Francisco Bay. The river has a total length of 1210 miles, of which 750 miles are in the United States. The southern limits of its basin are in Nevada and the eastern boundary of the basin is the continental divide. The Columbia, with its tributaries, drains parts of seven states and a large part of British Columbia. The total area of the basin is approximately 259,000 square miles.

The maximum discharge of the Columbia River customarily occurs in early summer, usually in June. It results principally from the melting of snow in the Rocky Mountains and contiguous ranges from Yellowstone Park, Wyoming, on the south to Mt. Robson Park, British Columbia, on the north. In the period from 1858 to 1947 there have been four occasions on which the flow of the river at the Dalles has exceeded 900,000 feet per second: in 1862, 1876, 1880 and 1894. From the mouth of the Snake to and through the Cascade Range the river in general flows through a narrow valley or gorge. From the head of tidal waters near Bonneville to the sea, a distance of 142 miles, the bottom land areas vary in width from a few hundred feet to about six miles.

The Corps of Engineers of the United States Army has made the following formal reports relating to flood control and bank protection on the Columbia River: a report dated 1918 entitled "Carrolls to Stella, Washington"; a report dated 1926 entitled "Martin Bluff to Lewis River, Washington"; a report dated 1928 entitled "Bank Protection Between Ilwaco and Chinook, Washington"; a report dated 1931 entitled "Protection of Banks and Dikes to Prevent Shoaling by Erosion"; a report dated 1931 entitled "Columbia River and Tributaries"; a report dated 1935 entitled "Flood Control Report"; a report dated 1936 entited "Columbia River and Tributaries"; and a report dated 1937 entitled "Preliminary Examination for Flood Control of Columbia River."

2. *Site of Peninsula Drainage District No. 1.* Peninsula Drainage District No. 1, the site of Vanport, is situated in Multnomah County, Oregon. It lies approximately 106 miles above the mouth of the Columbia River and approximately 4 miles above the confluence of the Columbia and Willamette Rivers. The general boundaries of Peninsula Drainage District No. 1 are: on the north, Oregon Slough; on the south, Columbia Slough; on the west, low lands subject to flood; on the east, another Drainage District known as Peninsula Drainage District No. 2. The boundary between Districts Nos. 1 and 2 is the highway fill known as Denver Avenue. West of the westerly boundary of District No. 1 is land which the Columbia River floods during most high waters. Between this area frequently subject to flood and District No. 1 are two railroad fills and a highway fill. One railroad fill supports the tracks of the Spokane, Portland & Seattle Railway Company and the other supports the tracks of

the Union Pacific Railroad Company. The highway fill supports North Portland Road. The railroad fills join and the tracks connect at a point approximately midway between Oregon Slough and Columbia Slough. When the Columbia River is in high flood, water surrounds Peninsula Drainage District No. 1 on the north, west and south. The water from the Columbia River on the west and south is backwater which carries no perceptible current.

Unless otherwise noted, the situation described in this agreed statement of facts existed during May, 1948, and particularly on May 30, 1948.

3. *Elevation of Peninsula Drainage District No. 1.* The northern portion of Peninsula Drainage District No. 1, an area approximately 1,000 feet wide paralleling Oregon Slough, has an average elevation of between 28 and 30 feet m.s.l. (mean sea level) and lies approximately 5 feet above average flood height in the Columbia River. The balance of the area within the District varies in elevation from 6 to 30 feet m.s.l. and in the absence of protecting embankments much of it would be inundated during all flood stages of the river. In periods of medium flow of the river most of District No. 1 would not be inundated even if there were no embankments to protect it. In periods of very low flow and in the absence of rain water the entire area, except for a few lake bed areas and sloughs, would be dry, even without the embankments. Prior to the construction of flood control structures and for many years thereafter, most of the area within what is now District No. 1 was used for agricultural and grazing purposes. A small part of the area about midway along its westerly boundary was an arm of Smith Lake. During periods of minimum flow in the river Smith Lake exists but it does not extend sufficiently far east to reach the District. In periods of prevailing low flow in the river Smith Lake, in the absence of embankments or grading work within the District, would cover to a depth ranging from 0 to 6 feet approximately 40 acres of land within what is now

District No. 1. The total area within this District is 951 acres.

Before protective embankments and drainage systems were installed the area which is now District No. 1 was partially covered from time to time during the rainy season with surface water.

All references in this agreed statement of facts to mean sea level are to mean sea level as fixed by the 1929 adjustment.

4. *The Drainage of Peninsula Drainage District No. 1.* The natural drainage of Peninsula Drainage District No. 1 is from east to west and from north to south. Drainage water is collected in sloughs and shallow ditches which converge on a pumping station located near the Columbia Slough levee about 1,500 feet east of the junction of that levee and the Union Pacific Railroad Company fill. One such drainage ditch generally parallels the inside toe of the Union Pacific Railroad Company fill. The pumping station near the Columbia Slough levee is the main pumping station within the District and there is no way for drainage water to be removed from the District except through this station. The pumps within the station transfer drainage water from the District to Columbia Slough. They have a total rated capacity of approximately 30,000 gallons per minute.

About 1,000 feet south of the junction between the Union Pacific Railroad Company fill and the fill of the Spokane, Portland & Seattle Railway Company there is a pumping station located on the shallow drainage ditch which parallels the toe of the Union Pacific fill. This station lifts water about four feet from the drainage ditch and deposits it in another ditch or slough where it flows to the main pumping station and is removed from the District. There are two pumps at this station, one a fourteen inch pump operated by a twenty-five horsepower motor and the other a twenty inch pump operated by a twenty horsepower motor. They each have a capacity of 3,000 to 4,000 gallons per minute. They are so arranged that when the water level within the drainage ditch reach-

es a fixed elevation they operate automatically until the water level has been lowered two feet.

5. *The North and South Embankments: Levee Work by Peninsula Drainage District No. 1.* Peninsula Drainage District No. 1 was organized on June 1, 1917, under the drainage district laws of the State of Oregon and has ever since continued in existence. In 1917, when the District was organized, the railway fills along the west side of the District were or were about to be constructed and those fills were then the only protective embankments for the District on the westerly side. The Denver Avenue fill was in existence in 1917 and that fill became the only protective embankment for the District on the easterly side. The Drainage District undertook the work of providing protection on the north and south sides. The north levee was originally located partly adjacent to and partly immediately behind (south of) the high ground paralleling Oregon Slough. This levee was constructed by hydraulic methods. Sand was dredged from Oregon Slough and pumped to the site of the levee. The levee was constructed to a minimum elevation of approximately 30 feet m.s.l. with a crown width averaging 10 to 12 feet and slopes of approximately 1 on 5 (one foot of vertical elevation for every 5 feet of horizontal distance) to give a base width at the inside average ground level of 50 feet or more. The levee together with the high ground which formed a part of it extended for approximately 7,000 feet from Denver Avenue on the east to the railroad fills on the west. The levee work was completed by 1918.

The south levee was located along the right bank of and parallel to Columbia Slough. This levee was also completed by 1918. Material was borrowed from the Columbia Slough area and hoisted to the site of the levee. The levee was constructed to a minimum elevation of approximately 30 feet m.s.l. with a crown width averaging 8 feet and slopes of approximately 1 on 3 to give a base width at the inside average ground level of 70 feet or more. The levee was approximately 7,500 feet long. The levees thus constructed by Drainage Distict No. 1 were intended to provide protection against a flood in the Columbia River equal to the 1876 flood, the second highest on record at that time.

The total cost to the Drainage District of constructing these levees was $21,376.64. Peninsula Drainage District No. 1 has no source of funds other than assessments against the land included in the District. Funds to pay the cost of the levees were obtained in the first instance by the sale of bonds to Peninsula Industrial Company, one of the Swift companies. Funds to redeem the bonds were obtained by annual assessments against the land within the District at the rate of $7 per acre. The District now has and ever since its organization has had power to arrange for such assessments to provide funds for the construction or maintenance of levees which protect the District.

In 1935 the Corps of Engineers, at the direction of Congress, investigated and reported to Congress on the condition of levees along the Columbia River, including those constructed by Peninsula Drainage District No. 1. They had then settled to such an extent that in some places the top of the levee was from 0.5 to 1.5 feet below the 1876 flood plane. In the judgment of the Engineers they were also of insufficient section to provide the protection for which they were intended.

6. *The North and South Embankments: Levee Work by the Corps of Engineers.* In 1934 it was suggested to Congress that Federal funds should be expended to give additional flood protection to various areas within the Columbia River basin including Peninsula Drainage District No. 1. By an Act entitled "An Act To provide a preliminary examination of Columbia River and its tributaries in the State of Washington, with a view to the control of its flood waters" approved June 13, 1934, Public Law No. 339, 73rd Congress 48 Stat. 954, Congress authorized the Secretary of War to make a preliminary survey of the Columbia River and its tributaries and

make a recommendation to Congress as to the desirability of expending Federal funds for flood control purposes. Pursuant to this authorization, the Corps of Engineers prepared a report recommending, among other things, that the north and south levees of Peninsula Drainage District No. 1 be raised and strengthened. By Section 5 of the Flood Control Act of 1936, 49 Stat. 1590, 33 U.S.C.A. § 701h Congress authorized the War Department, under direction of the Secretary of War and supervision of the Chief of Engineers, to proceed with this work at an estimated cost of $133,300 and with the local cooperation specified in the Act. The Peninsula Drainage District No. 1 project as thus proposed and approved did not include protection for the industrial plants situated on the northerly strip of high ground paralleling Oregon Slough. This was for the reason that the north levee as constructed by Peninsula Drainage District No. 1 was partly behind rather than in front of this high ground. In order to provide protection to the high ground and the industrial plants located upon it, the project for Peninsula Drainage District No. 1 was amended and a project report revised accordingly and dated April 25, 1940, was approved by the Chief of Engineers and by Peninsula Drainage District No. 1.

The flood protection structures for Peninsula Drainage District No. 1 authorized by Congress and the work undertaken by the Corps of Engineers and approved by Peninsula Drainage District No. 1 was confined entirely to the north and south levees of the District. The work done on the north consisted of the construction of approximately 0.45 miles of river front concrete wall and approximately 0.74 miles of earth levee and appurtenant work. The work done on the south consisted of the reconstruction of approximately 1.4 miles of earth levee, thereby raising the existing levee from 3 to 6 feet. Both levees were constructed to a mean sea level elevation of 34.9 feet at the upstream end and 34.6 feet at the downstream end of Peninsula Drainage District No. 1. The crown width

of the north levee varied from 6 to 12 feet. The crown width of the south levee was 12 feet and it was approximately 25 feet above average ground level on the landward side. The riverward and landward slopes of the north levee ranged between 1 on 1½ to 1 on 3 to give an approximate width at the inside average ground level of 44 feet or more. The south levee had a riverward slope of 1 on 2½ and a landward slope of 1 on 3 to give an approximate width at the inside average ground level of 150 feet or more. The levees were reconstructed from material taken from borrow pits within Peninsula Drainage District No. 1. This material was predominantly silt and clay. It was hauled to the levee sites by trucks or carryalls. The construction work was done by private contractors according to plans and specifications established by the Corps of Engineers.

The work of the Corps of Engineers on the levees was completed in 1941. Control of the levees was formally surrendered to Peninsula Drainage District No. 1 on September 15, 1941. Subject to the rights, if any, which the United States acquired by virtue of the condemnation proceeding begun on November 4, 1942, in the District Court of the District of Oregon, 109 F. Supp. 213, Civil No. 1604, neither the land on which these levees are situated nor the levees themselves belong to or have ever belonged to the United States. Subject to such contentions as may hereinafter be made with respect to the high water period of May 1948, at no time subsequent to September 15, 1941, have these levees been controlled or maintained by the United States or any agency or employee of the United States.

7. *The Eastern Embankment.* The easterly boundary of Peninsula Drainage District No. 1 is the highway fill which supports Denver Avenue. This fill was constructed in 1915 and 1916 by Multnomah County, Oregon, at the expense of the Interstate Bridge Commission as one of the approaches to the Interstate Bridge which crosses the Columbia River. The fill was constructed by hydraulic methods on land

belonging to Multnomah County. A suction dredge pumped sand from Oregon Slough to the site of the fill. The fill was built to an elevation of approximately 37.6 feet m.s.l. with a crown width of approximately 92 feet (of which 56 feet were paved) and slopes of approximately 1 on 3 to give a width at average ground level of 317.6 feet or more.

The Interstate Bridge Commission transferred control over the fill to Multnomah County, Oregon, on January 1, 1929. Multnomah County in turn transferred the fill and the land on which it rests to the State of Oregon on March 26, 1937. Since then the fill has always been and now is owned by the State of Oregon and controlled by the Oregon State Highway Department. Neither the land on which the fill is located nor the fill itself belongs or has ever belonged to the United States and (subject to such contentions as may hereinafter be made with respect to the high water period of May, 1948) at no time has the fill ever been maintained or controlled by the United States or any agency, or employee of the United States.

8. *The Western Embankment: The Union Pacific Fill.* Between Peninsula Drainage District No. 1 and lands on the west subject to flood are located the railroad fill of the Spokane, Portland & Seattle Railway Company, the railroad fill leased by Union Pacific Railroad Company from Oregon-Washington Railroad & Navigation Company and the highway fill supporting North Portland Road. The Union Pacific fill extends northerly from Columbia Slough levee a distance of approximately 3,200 feet to where it joins the fill of the Spokane, Portland & Seattle Railway Company. Between this point of junction and the Columbia Slough levee flood waters can by-pass the S. P. & S. Ry. Co. fill and hence in this area, the Union Pacific fill alone prevents flood waters from reaching Peninsula Drainage District No. 1. North of the point of junction a single structure consisting of the combined railroad fills and the highway fill supporting North Portland Road is between the District and lands on the west subject to flood. It is this structure north of the point of junction which failed on May 30, 1948.

The Union Pacific fill south of the point of junction with the Spokane, Portland & Seattle Railway Company fill has a crown width of approximately 24 feet, an average height of approximately 30 feet above average inside ground level and slopes of approximately 1 on 1¾ to give the fill an average ground level width of 130 feet or more. This southerly fill was constructed between July 1909, and April 1911, by the Oregon & Washington Railroad Company, the predecessor in interest of the Oregon-Washington Railroad & Navigation Company from whom the Union Pacific Railroad Company leases the fill and the tracks which it carries. Under its lease the Union Pacific Railroad Company has full control over the leased tracks and the fill. Prior to the construction of the fill, which began in 1909, the tracks of the railroad were carried over the same site by a trestle. This trestle was constructed between February and September, 1908. The present fill was created by dumping material down through and over the trestle. The stringers of the trestle were removed but the piling was not. According to the best available information the material used to make the fill came from the portal area of the Peninsula tunnel. It was predominantly a sandy loam with some clay content.

North of the point of junction of the Union Pacific Railroad Company fill with the Spokane, Portland & Seattle Railway Company fill, the combined fill continues for a distance of about 1000 feet. At this point a fill supporting tracks of Spokane, Portland & Seattle Railway Company, Union Pacific Railroad Company (as Lessee) and Peninsula Terminal Company begins to turn eastward toward the industrial plants located on the high ground which constitutes the northerly portion of Peninsula Drainage District No. 1. The Spokane, Portland & Seattle Railway Company fill continues in a northerly direction to Oregon Slough.

According to best information now available that portion of the fill supporting the Union Pacific track which constitutes a single structure with the fill of the Spokane, Portland & Seattle Railway Company (and which includes the portion through which flood waters passed on May 30, 1948) was constructed some time between 1910 and 1918 by the same method which was used to construct the southern portion of the Union Pacific fill. The fill was built by dumping material of a sandy nature over and through an existing trestle. The trestle stringers were removed but the piling was not. This fill rests on land belonging in undivided interests to the Spokane, Portland & Seattle Railway Company and the Northern Pacific Railway Company. Subject to such contentions as may hereinafter be made with respect to the high water period of May, 1948, the

fill is and always has been owned, maintained and controlled by one or more of the railroad companies.

The entire fill carrying the Union Pacific tracks has been in daily use since it was first constructed. The daily volume of traffic has averaged between one and twenty trains. Subject to such contentions as may hereinafter be made with respect to the high water period of May, 1948, the fill has never subsided, caved or sloughed off and maintenance has consisted entirely of normal ballasting and normal track maintenance.

During May, 1948, and prior to May 30, 1948, 1510 cars weighing an average of 37.5 tons each, crossed the fill. On May 30, 1948, the following trains, weighing as follows, crossed the portion of the fill which failed at the hours noted below:

| Train | Weight in Tons | Time of Crossing |
|---|---|---|
| Switch engine with 15 loaded and 3 empty cars | 931.6 | 9:10 A.M. |
| Switch engine with 4 loaded and 15 empty cars | 544.6 | 9:30 A.M. |
| Switch engine with 1 loaded car | 181.4 | 2:15 P.M. |
| Switch engine only | 123.8 | 2:30 P.M. |

9. *The Western Embankment: The Spokane, Portland & Seattle Railway Company fill.* From the junction of the Union Pacific Railroad Company fill with the Spokane, Portland & Seattle Railway Company fill north to the Oregon Slough levee is approximately 3,550 feet. Flood protection in this area is provided to Peninsula Drainage District No. 1 by a single structure consisting of the railroad company fills and the fill carrying North Portland Road.

Construction of the Spokane, Portland & Seattle Railway Company fill was commenced in 1907 as part of the original construction of that railroad. The fill was built to carry the main line tracks of the railroad part of the way from the high ground north of Columbia Slough to the bridge across Oregon Slough. The dis-

tance across this low area is approximately 8,415 feet. From 1907 to 1918 the railroad was carried across this area in part by a fill and in part by trestlework. The southern 5,960 feet (which includes the area that failed) were filled; the next 2,105 feet to the North were trestlework; the last 350 feet were filled. The trestle was required because in 1907 when the railroad was built the area east and upstream of the railroad right of way was not protected from flood during high water of the Columbia River. Thus provision had to be made to permit drainage of that area as the river subsided to normal flow.

The material which was used to construct the 1907 fill was obtained from St. John's cut. It was almost entirely sand. The fill was built by first constructing a work trestle either along the central

portion or along one side of the site for the proposed fill. Material was then transported by rail from St. John's cut and dumped through and over the work trestle. The trestle piling was not removed. The stringers were removed. The fill was constructed to an elevation of approximately 46.37 feet m.s.l. with an average crown width of 32 feet and slopes of 1 on 1¾ to give an approximate base width at average inside ground level of 172 feet or more. The construction work was done by contractors holding contracts with the Spokane, Portland & Seattle Railway Company and it took place in 1907 and 1908. The work trestle was not intended to and never did carry ordinary railroad traffic. Upon completion of the fill and the removal of the trestle stringers the entire weight of the rail traffic rested on the fill and not the trestle. The fill as thus constructed in 1907 and 1908 extended from the high ground north of Columbia Slough to a point 2,455 feet south of the southern abutment of the Oregon Slough railroad bridge. It was a section of this fill which failed on May 30, 1948.

By 1918 sufficient flood control structures had been erected so that the trestle work to the north of the 1907 fill was no longer required. In that year the then existing trestle was filled, partially by hydraulic methods. Sand was dredged from Oregon Slough and pumped over and through the trestle, which was not removed, until the fill reached an elevation of approximately 28 feet m.s.l. To complete the fill to its final elevation of approximately 46.37 feet m.s.l. material was rail hauled from St. John's cut and dumped over and through the trestle. The material was almost entirely sand. The trestle piling was not removed but the stringers were removed. The fill as completed had an average crown width of 32 feet and slopes of 1 on 3 riverward and 1 on 1½ landward to create an average base width at average inside ground level of 131 feet or more.

The entire Spokane, Portland & Seattle Railway Company fill is situated on land owned by that company and the Northern Pacific Railroad Company as tenants in common. A two-thirds interest in the land is owned by the Spokane, Portland & Seattle Railway Company and a one-third interest by the Northern Pacific Railway Company. The fill itself is owned in the same portions by the same companies. Subject to such contentions as may hereinafter be made with respect to the May 1948 high water period, the fill is and has always been controlled and maintained by the Spokane, Portland & Seattle Railway Company.

The fill is located on the main line of the Spokane, Portland & Seattle Railway Company and it has been in daily use since it was first constructed. Detailed traffic records are not available for the early years but from 1910 when railroad operations began until 1936 an average of not less than 14 passenger trains went across the fill each day, each train weighing an average of from 650 to 1000 tons. There was in addition a daily movement of freight trains each weighing an average of between 500 and 2000 tons. From 1936 to 1942 an average of not less than 20 trains crossed the fill each day, each weighing an average of at least 1000 tons. From 1942 to date the fill has carried an average of 45 trains a day, each weighing an average of 1500 tons.

The detailed train records of the Spokane, Portland & Seattle Railway Company show that during the period from May 15 to and including June 15, 1946, 1442 trains crossed the fill weighing a total of 2,526,013 tons. For the same period during 1947, 1590 trains crossed the fill weighing a total of 2,951,214 tons. Subject to such contentions as may hereinafter be made with respect to the high water period of May, 1948, the fill has never subsided, caved or sloughed off and maintenance has consisted entirely of normal ballasting and normal track maintenance.

During May 1948, 1347 trains weighing 2,428,203 tons crossed the fill. During May 30, 1948, the trains listed below, weighing as follows, crossed the fill at the times noted below:

| Eastbound | | | Westbound | | |
|---|---|---|---|---|---|
| Train No. | Tons | Time | Train No. | Tons | Time |
| 30 | 135 | 6:50 A.M. | 3 | 1713 | 12:05 A.M. |
| 531 | 2762 | 7:03 A.M. | Extra 1797 | 2401 | 12:40 A.M. |
| 671 | 1665 | 7:13 A.M. | " 3981 | 3525 | 2:18 A.M. |
| 6 | 562 | 9:20 A.M. | " 531 | 1317 | 3:47 A.M. |
| 457 | 1735 | 9:26 A.M. | " 30 | 2115 | 4:45 A.M. |
| 1797 | 2866 | 12:01 P.M. | " 2124 | 1730 | 4:56 A.M. |
| 704 | 1325 | 12:39 P.M. | " 1804 | 2905 | 5:16 A.M. |
| Extra 23 | 3335 | 1:07 P.M. | 701 | 1565 | 7:16 A.M. |
| " 54 | 474 | 3:18 P.M. | Extra 1777 | 2574 | 8:25 A.M. |
| | | | " 23 | 430 | 10:40 A.M. |
| | | | " 3978 | 4735 | 1:07 P.M. |
| | | | 703 | 907 | 1:47 P.M. |

10. *The Western Embankment: North Portland Road.* Immediately to the west of the fill of the Spokane, Portland & Seattle Railway Company is the highway fill supporting North Portland Road. On May 30, 1948, and for several years prior thereto this fill was separated from the fill of the Spokane, Portland & Seattle Railway Company by a depression 5 or 6 feet deep and 8 to 10 feet wide. The depression did not extend to the original natural ground level and below the surface of the depression the highway fill and the railroad fill joined to constitute a single structure.

This highway fill was constructed in 1933 by Multnomah County, Oregon. The fill was constructed by hydraulic methods. Sand was dredged from Oregon Slough and pumped to the site of the fill. North Portland Road between Columbia Slough and Oregon Slough lies on a slight grade; hence the elevation of the fill varies from place to place. At the point where the fill failed on May 30, 1948, it had an elevation of 29.9 feet m.s.l., a crown width of 34 feet and slopes of 1 on 5 to give a width to the fill of approximately 83 feet at the point where it joined the Spokane, Portland & Seattle Railway Company fill and a width at the base of the fill of approximately 175 feet.

The fill and the right of way to maintain it were transferred by Multnomah County to the State of Oregon on September 27, 1933. The fill has ever since been maintained and controlled by the Oregon State Highway Department. In 1933 that Department paved the fill to a width of approximately 22 feet with 7 to 9 inches of concrete. The concrete was laid on a layer of clay one foot thick. The land on which the fill is located does not belong to the United States. Subject to such contentions as may hereinafter be made with respect to the May 1948 high water period, neither the United States nor any agency or employee of the United States has ever controlled or maintained the fill.

North Portland Road has been in daily use since 1933. Detailed traffic figures are available for the period subsequent to 1939 and they show that traffic over the fill has averaged about 1500 cars per day. The fill has never subsided, caved or sloughed off and only normal highway maintenance has been required.

11. *The Time and Location of the Failure.* Vanport was flooded on May 30, 1948, by a break in the western embankment of Peninsula Drainage District No. 1. The failure occurred between 4:00 and 4:30 p. m. The northern end of the break was at a

point 2,605 feet from the south end of the Spokane, Portland & Seattle Railway Company bridge across Oregon Slough. The southern end of the break was at a point 2,850 feet north of the northern end of the railroad bridge across Oregon Slough. The width of the break was 590 feet.

The failure occurred at a point where the western embankment had all been constructed on the bottom of an arm of Smith Lake. The lake bottom at this point, as far as is known, was the natural soil of the area consisting of sand and silt. At the point of the failure that portion of the western embankment supporting the Union Pacific tracks had been constructed around and over a trestle designed to carry the tracks of the railroad. That portion of the western embankment supporting the Spokane, Portland & Seattle Railway Company tracks at the point of failure had been constructed around and over a work trestle but not a main line trestle.

12. *Water Elevations at the Time of Failure and in Prior Years.* The elevation of the water adjacent to the western embankment at the time of failure on May 30, 1948 was 30.8 feet m.s.l. Maximum water elevations at this point and the date of highest water during each year from 1907 forward are listed below:

| Date | | Water Elevation (m.s.l) |
|------|-----|-------------------------|
| Year | Day | |
| 1907 | June 10 | 22.3 |
| 1908 | June 20–21 | 24.6 |
| 1909 | June 21–22 | 24.2 |
| 1910 | May 15–16 | 21.8 |
| 1911 | June 20 | 22.0 |
| 1912 | June 2 | 22.2 |
| 1913 | June 13 | 26.6 |
| 1914 | May 28 | 19.4 |
| 1915 | June 1 | 14.8 |
| 1916 | July 3–6 | 26.7 |
| 1917 | June 22 | 26.7 |
| 1918 | June 26 | 22.3 |
| 1919 | June 1–2 | 21.5 |
| 1920 | June 26–27 | 17.4 |
| 1921 | June 12 | 27.4 |
| 1922 | June 11 | 25.6 |
| 1923 | June 16–17 | 22.8 |
| 1924 | May 28–29 | 17.5 |
| 1925 | May 25–26 | 24.5 |
| 1926 | May 10 | 12.1 |
| 1927 | June 18–20 | 26.1 |
| 1928 | May 31 | 27.6 |
| 1929 | June 20 | 19.9 |
| 1930 | June 15 | 14.0 |
| 1931 | May 20 | 12.8 |
| 1932 | May 25 | 23.8 |
| 1933 | June 19 | 27.7 |
| 1934 | May 9–10 | 19.3 |
| 1935 | June 11–12 | 20.1 |
| 1936 | June 11 | 22.6 |
| 1937 | June 24 | 19.0 |
| 1938 | June 10 | 23.7 |
| 1939 | May 22 | 16.4 |
| 1940 | June 6 | 15.3 |
| 1941 | May 12 and June 11 | 11.4 |
| 1942 | May 30 | 18.6 |
| 1943 | June 23, 24 | 22.1 |
| 1944 | June 20 | 13.3 |
| 1945 | June 10 | 20.6 |
| 1946 | June 1 | 23.6 |
| 1947 | June 13 | 21.3 |
| 1948 | June 1, 13, 14 | 32.4 |

13. *Title to the Vanport Site.* On November 4, 1942, the United States filed a declaration of taking in a condemnation proceeding in the United States District Court for the District of Oregon, Civil No. 1604, to acquire title to and it did thereby acquire title to the following described property, constituting 647.4 acres, more or less, located in Multnomah County, Oregon, and within the limits of Peninsula Drainage District No. 1:

"Beginning at a point on the east line of the O. W. R. & N. Company's right of way and south line of the Alexander Brown Donation Land Claim in Section 5 Township 1 North, Range 1 East, Willamette Meridian, and Section 32, Township 2 North, Range 1 East, Willamette Meridian, said point being also described as bearing south 67° 27′ east 472.00 feet from the southwest corner of the

Alexander Brown Donation Land Claim; running thence north 0° 28′ east along the east side of said right of way of the O. W. R. & N. Company 2149.0 feet; thence continuing along said right of way along a transition curve to the right, increasing in curvature 0° 15′ from tangent every 29.62 feet, a distance of 325.8 feet; thence along a curve to the right whose radius is 1835.8 feet and whose initial tangent bears north 3° 41′ east a distance of 835.6 feet to the east right of way line of Spokane, Portland and Seattle Railway Company; thence north 40° 36′ east following the east line of said right of way 1170.0 feet to the south line of that 40-foot right of way conveyed by H. G. and Grace H. Laycock to Spokane, Portland and Seattle Railway Company and Oregon & Washington Railroad Company by deed recorded May 22, 1908, as Exhibit A in plat book 414 at Page 82, Deed Records of Multnomah County, Oregon; thence north 45° 49′ east along said right of way line 440.0 feet; thence along a curve to the right whose radius is 1121.0 feet and whose initial tangent bears north 45° 49′ east a distance of 32.9 feet more or less to the southwest corner of that 26.4 acre tract conveyed by Peninsula Industrial Company to Swift & Company by deed recorded July 24, 1936, in P. S. Book 347 at Page 212, Deed Records of Multnomah County; running thence south 66° 32′ east along the south line of said 26.4 acre tract, extended easterly, a distance of 3783.24 feet more or less to the southeast corner of that 21.68 acre tract conveyed to Portland Union Stock Yards Company by Peninsula Industrial Company by deed recorded May 29, 1926, in book 1063 at Page 15, Deed Records of Multnomah County, running thence south 23° 28′ west 717.0 feet more or less to the southwest corner of that 3.0 acre tract conveyed to A. R. Benson and E. L. Pennock by Harry Mercer and Louise

K. Mercer, by deed recorded January 4, 1939, in P. S. Book 478 at page 365, Deed Records of Multnomah County; running thence south 66° 32′ east 363.7 feet more or less to the northwest corner of that 80.0 acre tract conveyed to Oregonian Publishing Company by Peninsula Industrial Company by deed recorded August 18, 1936, in P. S. Book 350 at page 524, Deed Records of Multnomah County; running thence along the west line of said 80.0 acre tract south 8° west 1120.0 feet; thence along the south line of said 80.0 acre tract south 55° 40′ east 680.00 feet; thence south 82° east 1730.0 feet more or less to the west line of the Denver Avenue Approach to the Interstate bridge; thence south 11° 42′ west following along the west side of said Denver Avenue approach 2766.00 feet more or less to the center line of Force Lake, thence following along the center line of said Force Lake, as designated in Judgment Roll No. 44715 of the Circuit Court Journal for Multnomah County, north 82° 14′ west 100.1 feet; south 79° 23′ west 330.0 feet; north 74° 28′ west 178.00 feet; and south 84° 33′ west 316.8 feet; thence west 204.0 feet more or less to the north bank of the Columbia Slough; thence following along the meanders of the north bank of the Columbia Slough more definitely described as running north 64° 32′ west 1232.0 feet more or less to the southeast corner of the Alexander Brown Donation Land Claim; thence north 67° 22′ west along the south line of said Alexander Brown Donation Land Claim 1975.0 feet to the southwest corner of Lot 5 of Brown's partition of the east one-half of said claim; thence north 67° 22′ west 628.8 feet to the center of channel between Columbia Slough and Bayou Slough; thence north 22° 22′ west 212.1 feet; thence south 89° 26′ west 380.8 feet to the south line of the Alexander Brown Donation Land Claim; thence north 67° 22′ west

along the south line of said claim 1486.1 feet more or less to point of beginning, also known as tax Lots 12, 13, and 14 in Section 4, Township 1 North, Range 1 East, Willamette Meridian."

Subject however to the following:

"1. Easement for public utilities existing in, upon and over said premises and any portion thereof.

"2. The rights of Peninsula Drainage District No. 1 and its employees to enter upon said premises for the purpose of maintaining, altering or repairing the dikes, ditches and other facilities of said District, located thereon, and for such purpose to land dredges on said property and to take any other reasonable steps necessary to protect said District against leakage, overflow, bank destruction and flood waters and the right of said Drainage District to enforce the provisions, conditions and restrictions in the deed from Harry Mercer and Louise K. Mercer, his wife, to E. W. A. Peake and Wanda Peake, Husband and Wife, dated February 3, 1939 in book 483, page 123 Deed Records of Multnomah County to the effect that said grantees, their heirs and assigns shall not permit any damage to the dikes, ditches or other facilities of said District or alteration thereof in any respect or allow any construction thereon without the approval of said District.

"3. An easement of right of way for the benefit of Peninsula Drainage District No. 1, its officers, agents and employees extending from the main pumping plant of said District on Bayou Lake to the nearest point on any paved or surfaced roadway to be constructed by the owner of the premises over or across said premises, such right of way to be for the purpose of providing access for said pumping plant and said right of way to be 30 feet in width, such conditions and restrictions appearing in a deed from F. R. Deuell and Lena D. Deuell, his wife, to E. W. A. Peake and Wanda Peake, husband and wife, dated February 6, 1939, and recorded February 8, 1939, in book 483, page 129, Deed Records of Multnomah County.

"4. The right, title and interest of the State of Oregon in and to any portion of the premises included within the boundaries of any navigable waters and the rights of navigation and fishery therein."

Subject to those certain deeds recorded on September 10, 1947, and December 30, 1949, at Book 1262, p. 163, and Book 1379, p. 8, respectively, of the county records of Multnomah County, Oregon, the United States now owns and ever since 1942 has owned the above described property. Vanport was located on a portion of this property.

14. *Selection of the Vanport Site and Construction of the Project.* Vanport was constructed for the purpose of providing housing for persons engaged in war work in the Portland, Oregon-Vancouver, Washington, area and particularly for employees of the three shipyards in that area operated by Kaiser Company, Inc. Vanport was within three miles of each of the three yards.

In the summer of 1942 the Kaiser yards were employing approximately 46,000 persons. Kaiser Company, Inc., expected to expand the operation of the yards and to employ in that connection a total of about 97,000 persons. It therefore became necessary to provide housing for the new employees. Existing facilities in the Portland area were already overburdened. Accordingly, Kaiser Company, Inc., proposed to the United States Maritime Commission, an agency of the United States, that the company construct with funds to be provided by the Maritime Commission 10,000 dwelling units in the Portland-Vancouver area at an estimated cost of $21,-905,400. Of these units 4,000 were to be located in or near Vancouver, Washington, and 6,000 were to be located in the Portland area. The site proposed by Kai-

ser Company, Inc., for the 6,000 Portland units was the Vanport site. Kaiser Company, Inc., then held an option to buy 640 acres within Peninsula Drainage District No. 1 and it was proposed that 300 of the 600 acres be used for the housing project. The Kaiser proposal was submitted to the Maritime Commission in July, 1942.

In July, 1942, National Housing Agency, an agency of the United States (created by the President of the United States by Executive Order No. 9070, dated February 24, 1942, 50 U.S.C.A.Appendix, § 601 note) with authority to provide war housing, had no funds available for the Vanport project. It was anticipated that funds for that purpose would become available about September 15, 1942. The Maritime Commission, because of the urgent need for war shipping, was unwilling to delay construction of the Vanport housing until that date. Accordingly, an arrangement was made between the Maritime Commission, National Housing Agency and Kaiser Company, Inc., whereby the Maritime Commission authorized Kaiser Company, Inc., to proceed immediately with the construction of 6,000 units at the Vanport site at an estimated cost not to exceed $13,200,000. It was understood that when Congress provided funds to the National Housing Agency, a formal contract for the construction of the housing would be executed between the National Housing Agency and Kaiser Company, Inc., and that upon the execution of that contract the arrangement between the Maritime Commission and Kaiser Company, Inc., would be cancelled.

These steps were taken as planned. Funds were made available by Congress to the National Housing Agency and thereafter a contract was made between the United States, represented by the Federal Public Housing Authority, (a constituent unit of National Housing Agency and created by Executive Order No. 9070, dated February 24, 1942) and Kaiser Company, Inc., whereby Kaiser Company, Inc., agreed on a cost-plus-a-fixed-fee basis to construct the Vanport housing. The contract was executed as of August 1, 1942. Kaiser Company, Inc., in turn subcontracted the construction work to two Portland construction contractors, George H. Buckler and Charles B. Wegman. In constructing Vanport, Kaiser Company, Inc., and its subcontractors were independent contractors. They were neither agents nor employees of the United States. Construction of Vanport began in September, 1942. The land on which Vanport was built was acquired by the United States from Kaiser Company, Inc., and others by a condemnation proceeding filed November 4, 1942.

On September 28, 1942, an agreement was made between the United States, acting through the Federal Public Housing Commissioner, and the Housing Authority of Portland whereby the United States arranged for the Housing Authority of Portland to assist in work connected with the construction of Vanport. This agreement of September 28, 1942, was Supplement No. 8 to an earlier agreement between the parties dated June 17, 1942, which described in general terms the nature of the work to be undertaken by the Housing Authority of Portland in connection with the construction of war housing projects. Since on September 28, 1942, the site for Vanport had been selected, the plans for its construction had been made, the construction contracts had been executed and construction was actually under way, the Housing Authority of Portland had in fact and undertook no responsibility in connection with these matters. Its activity under the agreement of September 28, 1942, was confined to making disbursements of funds provided by the United States to pay for the costs of constructing Vanport and conducting the necessary audits in that connection.

Dwelling units at Vanport first became available for occupancy on or about December 15, 1942. The construction of Vanport was substantially completed by August 6, 1943. As completed, Vanport consisted of approximately 1,000 buildings containing approximately 10,000 dwelling

units together with commercial facilities, administrative offices, service annexes, and social, recreational and community facilities. The dwelling units at Vanport were furnished at the expense of the United States and the furnishings belonged to the United States. The cost to the United States of constructing and furnishing Vanport, including the cost of the land, was approximately $25,750,000. Upon the completion of the construction of Vanport, all obligations of the United States and the Housing Authority of Portland under the contract of September 28, 1942, were satisfied and discharged.

By an instrument designated a lease and effective as of October 15, 1942, and numbered HA (ORE–35053) mph 101, the United States, acting through the Federal Public Housing Authority, made an arrangement concerning Vanport with the Housing Authority of Portland. Thereafter and on April 12, 1943, these parties entered into a second agreement numbered HA (ORE–35053) mph 102, whereby the instrument of October 15, 1942, was rescinded as of the date of its execution and the instrument of April 12, 1943, substituted in its place. This second instrument continued in effect until the parties on February 17, 1944, executed a new instrument numbered HA (ORE–35021) mph 102 which became effective as of January 1, 1944. This instrument of February 17, 1944, related not only to the premises of Vanport but to other premises as well. It is frequently referred to as the master lease. It was in effect on May 30, 1948.

During the period prior to May 30, 1948, the parties executed a number of amendments to the so-called master lease. Five of these amendments, Amendments Nos. 1, 2, 5, 6 and 7, had application at Vanport. The other amendments related entirely to other projects held under the so-called master lease. Amendment No. 1, dated November 16, 1944, added provisions to the lease relating to the obligations of the parties in connection with portions of the premises no longer needed for war housing and designated by the United States as in a stand-by or terminated status. Amendment No. 2, dated March 6, 1945, provided for the surrender to the United States and the exclusion from the instrument of the cafeteria and restaurant buildings located at Vanport. Amendment No. 5, dated November 1, 1945, cancelled Amendment No. 2 and provided in effect that the restaurant and cafeteria buildings should again become subject to the so-called master lease. Amendment No. 6, dated December 28, 1945, modified the amount of the petty cash fund at Vanport and elsewhere. Amendment No. 7, dated April 1, 1948, further amended the provision of the so-called master lease in connection with the sale and disposition of projects or portions of projects no longer required for war housing purposes.

When Vanport was constructed it was not intended to be a permanent housing installation and from time to time, and particularly after the surrender of Japan, some of the housing at Vanport was declared surplus. By May 30, 1948, 240 buildings containing approximately 4,000 dwelling units had been declared surplus and removed. As of that date all the housing at Vanport west of North Meadows Avenue and most of the housing between North Meadows Avenue and North Lake Streets had been removed. On May 30, 1948, the distance between that portion of the western embankment which failed and the nearest dwelling unit either occupied or available for rent was approximately 1866 feet.

15. *The Organization of the Housing Authority of Portland.* The Housing Authority of Portland was created on December 11, 1941, by resolution of the City Council of Portland, Oregon, acting under the authority of the Oregon State Housing Authorities Law. O.C.L.A. § 99–2001 et seq. In accordance with the provisions of that statute the mayor of Portland appointed five commissioners, later increased to seven upon an amendment of the statute, Laws 1949, c. 130, to manage and direct the Authority. For some years prior to 1941 civic leaders in

Portland, and particularly those connected with the Portland Housing and Planning Association, had been giving attention to the local housing situation and the desirability of providing residents with low rent housing. With the development in Portland of defense and war industries, particularly ship construction, it became apparent that some affirmative action was required. The Housing Authority of Portland (HAP) was created in response to this situation.

The persons who served as commissioners of HAP prior to January 1, 1950, and their terms of office, are as follows:

| Commissioner | Appointed | | Expiration |
|---|---|---|---|
| C. M. Gartrell | 12/11/41 | Resigned 9/1/44 | 12/11/46 |
| Sanford E. Norby | 9/1/44 | Resigned 1/7/49 | 12/11/51 |
| | 1/15/47 | | |
| Mrs. Ralph W. Rasmussen | 1/10/49 | | 12/11/51 |
| Maria C. Jackson | 12/11/41 | Resigned 4/14/42 | 12/11/42 |
| Charles B. Wegman | 4/15/42 | Resigned 9/12/42 | |
| Harry T. Capell | 9/14/42 | | |
| | 12/11/42 | Deceased 10/8/45 | 12/11/47 |
| Charles S. Camplan | 10/26/45 | | |
| | 12/12/47 | | 12/11/52 |
| Herbert J. Dahlke | 12/11/41 | | 12/11/43 |
| | 12/11/43 | | 12/11/48 |
| | 12/29/48 | | 12/11/53 |
| Delmore L. Knickerson | 12/11/41 | Deceased 6/30/44 | 12/11/45 |
| H. J. Detloff | 7/27/44 | | 12/11/45 |
| | 12/20/45 | | 12/11/50 |
| Chester A. Moores | 12/11/41 | | 12/11/44 |
| | 12/11/44 | Resigned 12/17/45 | 12/11/49 |
| Lamar Tooze | 12/20/45 | Resigned 12/11/49 | 12/11/49 |
| Alfred H. Corbett | 12/19/49 | | 12/11/54 |
| J. J. Gard | 4/6/49 | | 3/20/53 |
| Rev. Thomas J. Tobin | 4/6/49 | | 3/20/54 |

The HAP commissioners in all instances have been Portland residents prominent in municipal affairs and familiar with housing problems. The commissioners serve without pay.

The persons who served as officers of HAP prior to January 1, 1950, and their terms of office, are as follows:

| Chairman | Vice-Chairman | Secretary-Treasurer |
|---|---|---|
| C. M. Gartrell 12/11/41 to 9/1/44 | Chester A. Moores 12/11/41 to 9/7/44 | Harry D. Freeman 12/30/41 to 4/15/50 |
| Chester A. Moores 9/7/44 to 12/17/45 | Herbert J. Dahlke 9/7/44 to 12/20/45 | |
| Herbert J. Dahlke 12/20/45 to 6/16/49 | H. J. Detloff 12/20/45 to 6/16/49 | |
| Lamar Tooze 6/16/49 to 12/11/49 | Mrs. Ralph W. Rasmussen 6/16/49 to date | |

16. *Housing Authority of Portland Projects*: Columbia Villa. The first project undertaken by HAP was the construction of Columbia Villa, a 400-dwelling unit housing project located in Portland and designed to provide low rent housing to Portland residents. The work on the project began in May, 1942. The completion date was June 15, 1943. To finance the construction of Columbia Villa HAP on July 10, 1942, borrowed from the United States, acting through the United States Housing Authority, $1,292,000. The loan bore interest at 3 percent per annum. Since HAP could obtain funds at a lower interest rate from private sources an arrangement was made whereby HAP borrowed to the extent of its requirements from banks and trust companies and the United States in effect guaranteed the repayment of the loan. On August 3, 1942, HAP, under this arrangement, borrowed $1,730,000. The United States at the same time agreed that should the occasion arise it would loan an equal amount to HAP and thus put HAP in funds to pay the private lenders. Upon completion of its loan from private sources, HAP repaid the loan it had obtained from the United States. From time to time HAP has refinanced its Columbia Villa loan with private lenders and it has from time to time applied net income from the operation of the property to reduce the indebtedness. As of May 30, 1948, the amount of the debt was $1,381,000 and it was owing to the Bessemer Trust Company of New York. The United States has at all times continued the "Guarantee" arrangement with HAP, but it has never been called upon to perform its "guarantee" obligations.

The United States, under its Columbia Villa contract with HAP, is obligated to make certain annual contributions (not to exceed in any year 3½% of the cost of constructing the project) to pay any deficiency resulting from the operation of the project as a low rent housing and slum clearance project. These contributions are to be made only as required and only as long as the original indebtedness for the construction of the project remains unpaid. During the period from the construction of Columbia Villa to January 1, 1950, the total amount thus contributed from the United States to HAP was $51,820.31. This amount was contributed during 1948 and 1949. Prior to 1948 Columbia Villa operated to produce income in excess of expenses.

HAP has agreed with the United States that the dwelling units at Columbia Villa will be rented only to families of low income, that is, to families who are in the lowest income group and whose income is not sufficient to enable them to live in decent and sanitary private housing. From time to time HAP with the approval of the Federal Public Housing Authority defines in dollars the income group which is entitled to apply for Columbia Villa housing.

Columbia Villa is owned by HAP and the United States has no interest in the property. As soon as the indebtedness incurred in connection with the construction of the project is paid, all obligations of HAP to the United States in connection with Columbia Villa will terminate and HAP will be entirely free to manage or dispose of the property as it sees fit. In the meantime, HAP maintains and operates the project and selects the tenants for the project within the family income limits agreed upon with the United States. Since the United States is obligated to make annual contributions to the project in the event that operating expenses exceed rental income the annual HAP budget for the project is submitted to and approved by the Federal Public Housing Authority.

17. *Housing Authority of Portland Projects: Projects Under the Master Lease.* Columbia Villa is owned by HAP. The other housing projects operated by the Authority are all owned by the United States. These federally owned projects

were all constructed as war housing projects and they are all located in Portland. These war housing projects, in addition to Vanport, are as follows:

| Name | Approximate number of Dwelling Units | Approximate Completion Date |
|---|---|---|
| Dekum Court | 85 | June, 1942 |
| The Gartrell Group | 725 | October 10, 1942 |
| The Guild's Lake Group | 2,600 | December 27, 1943 |
| University Homes | 2,000 | November 28, 1942 |
| St. Johns Woods | 1,000 | October 10, 1943 |
| Parkside Homes | 260 | January 8, 1943 |
| Slavin Court | 75 | September 27, 1943 |
| Fulton Homes | 324 | October 30, 1943 |
| Hudson Street Homes | 118 | March 1, 1943 |
| Fir Court | 72 | March 1, 1943 |
| Fairview Homes | 265 | September 7, 1943 |
| Bellaira Court | 110 | September 22, 1943 |
| Powers Dormitory | 500 | September 4, 1943 |
| East Vanport | 485 | April, 1944 |
| Fessenden Courts | 152 | January, 1944 |

With the exception of Dekum Court each of these projects is a temporary project.

With the exception of Vanport and Columbia Villa, each of the projects listed above was constructed under an arrangement whereby HAP made recommendations to the Federal Public Housing Authority, an agency of the United States, as to the necessity for housing in the area and as to available sites, available contractors and desirable types of construction. The construction was then undertaken by local contractors holding contracts with the United States, acting through the Federal Public Housing Authority (FPHA) or its predecessor agencies. Each project as it was completed was the subject of an agreement between the United States and HAP relating to the operation of the premises. Each of the projects was made subject to the so-called master lease of February 17, 1944.

The financial arrangement between the United States and HAP with respect to Columbia Villa has been described. The financial arrangement for HAP's other projects is set forth in the so-called master lease of February 17, 1944, as supplemented by the Administration Fund Agreement between the First National Bank of Portland, Oregon, and the Housing Authority of Portland, dated as of February 17, 1944. The arrangement between the parties contemplates that the United States will make, and from time to time the United States has made, advances to HAP to provide that Authority with funds for operating capital, to purchase coal, to purchase other stores, and to make payments in lieu of taxes. Payments in lieu of taxes are made by HAP to state and local governmental agencies in an amount approximately equal to what the taxes on the property would be if it were owned by private persons and not by the United States. The amount, date and purpose of the advances and the repayments of them are as follows:

[Here occurred a summary of PHA advances and repayments.]

The accounting between HAP and the United States in connection with these advances is separate and distinct from the accounting between the parties as to profits or losses from the lease operations. The advances are in the nature of loans for specific purposes and HAP has a general obligation to repay them. They are not evidenced by notes or other securities and they do not bear interest.

The financial arrangement between HAP and the United States under the so-called master lease contemplates that there will be an accounting between the parties as to profit or loss from the operation of the premises. Each year HAP prepares and submits to FPHA for its approval a detailed budget of all anticipated expense. If at the end of the year the income from the properties has not totalled the amount of operating expense which has received budget approval, the United States pays the deficiency. If, however, the income from the properties has exceeded the amount of approved operating expense, the excess is paid to the United States. Thus, any net income from the operation of the properties accrues to the United States and any authorized loss is borne by the United States. The result of operations under the so-called master lease are set forth below together with the result of operations at Vanport alone. The actual accounting between the parties is on an over-all basis rather than by separate projects. The reference "Prior year adjustment additional" refers to budget and accounting adjustments which were authorized and approved by FPHA subsequent to the close of the fiscal period. The figures in parentheses represent deficits.

[Here occurred a statement of operations of leased projects only.]

As a further expression of the management policy to be adopted in connection with the projects subject to the so-called master lease, HAP adopted Master Management Resolution No. 154. This resolution and its amendments, Resolutions Nos. 204, 216, 279, 286, 339, 391, 412, and 458 (all of which relate to changes in rent schedules) were in effect on May 30, 1948.

Beginning early in 1942 FPHA created and it has since maintained a Manual of Policy and Procedure. Prior to February 24, 1942, when FPHA was created by Executive Order No. 9070, United States Housing Authority, a federal corporation created by Congress, was concerned with low-rent housing and it issued from time to time so-called policy bulletins which described the policy of the agency. The FPHA Manual was, in effect, a continuation of these earlier policy bulletins.

The FPHA Manual is designed (a) to express FPHA policy and requirements on subjects which, under the so-called master lease, are for FPHA decision or approval; (b) to express the views of FPHA on subjects which are for decision by the local housing authorities but which involve the fundamental policy of the housing program; and (c) to provide information which may be of use to the local authorities, such as information concerning new statutes or regulations, the activities of other governmental agencies, etc.

The FPHA Manual is prepared in looseleaf fashion. From time to time and as changes are made in the applicable Federal statutes, or as new problems or new information comes to hand, FPHA distributes mimeographed releases to be inserted in the copies of the Manual maintained by local housing authorities and other interested persons. These releases are general in their terms in the sense that they are not directed to any particular person or any particular housing authority. Some of the releases relate to new subjects; others supplement or supersede existing releases.

The subjects covered by the releases are as follows: (a) budget and expense, including accounting; (b) care of and accountability for government property including property in a terminated or stand-by status and including the disposition of such property; (c) selection of tenants and rental arrangements; (d) rental rates; (e) community services; (f) commercial operations on the projects; and (g) reports. The releases are sometimes phrased in mandatory language; sometimes they are phrased in advisory or informative language.

The FPHA Manual relates to all housing operations in which FPHA has an interest, including both low rent and war housing. As of any given date, therefore, all the releases in the Manual are not applicable to any particular project. Those which are applicable to a given project can be identified by the content of the releases. As of May 30, 1948, there were approximately

125 releases or sections in the Manual relating to the management of war housing projects such as Vanport.

In addition to the Manual, FPHA from time to time has issued a number of advisory bulletins. These bulletins are intended to make available to all the local housing authorities information concerning efficient and economical methods of project operation developed by individual local authorities. With three or four exceptions all such bulletins issued by FPHA have related to construction work rather than to management.

The releases appearing in the FPHA Manual were not published in the Federal register.

18. *The Employees of the Housing Authority of Portland.* The day to day operations of HAP are in the control of its commissioners and officers. Neither the United States nor any federal agency or employee has participated in any way in the selection of the commissioners for or the officers of HAP. The employees of Housing Authority of Portland are employed by the executive director of the Authority with the approval, in the case of key employees, of the HAP commissioners. The executive director on four or five occasions has discussed persons proposed for employment by HAP with field representatives of FPHA. In each case the proposed employee was selected in the first instance by the HAP executive director and in each instance the decision on employment was made by him. Neither FPHA nor any other agency or employee of the United States has undertaken to suggest to HAP the names of persons whom it should employ. Except as noted above, neither the United States nor any agency or employee of the United States has participated in any way in the selection of the employees of HAP. All employees of HAP receive their instructions from representatives of that organization and not from representatives of the United States. From time to time, however, personnel of HAP personally or by mail have discussed HAP problems with FPHA employees.

The administrative organization of HAP is as follows. The ultimate responsibility for the management of the authority lies with commissioners appointed by the Mayor of Portland. The Chief executive officer of the authority is the executive director. All employees of the authority report directly or indirectly to the executive director who in turn reports to the commissioners. The principal departments of HAP are the Accounting and Audits Department and the Department for the Management of Projects. During the period of construction of the projects operated by HAP that organization also had a large Development Department. The Development Department was discontinued in September, 1944. The Accounting and Audits Department has charge of accounts, audits, payrolls and bonds. The Department for the Management of Projects has to do (a) with management functions such as tenant selection, project services, fire and safety, commercial leases, property and procurement and (b) with maintenance, including mechanical, electrical, heating, ventilating and plumbing maintenance for structures, grounds, stores, sanitation and transportation. As of May 30, 1948, the personnel complement of the Accounting and Audits Department was approximately twenty-one persons. The Department for the Management of Projects employed approximately 214 persons other than skilled craftsmen and in addition approximately 440 persons in skilled crafts and holding union status. HAP employs a Portland lawyer on a contract basis. No commissioner, officer or employee of HAP is an officer or employee of the United States or any federal agency, unless HAP is itself a federal agency. As of May 30, 1948, there were 675 persons employed by HAP. Of these, 300 were employed at Vanport: 60 as firemen, 15 in accounting work, 5 in project services and the remainder in maintenance work.

The terms and conditions of employment for all employees of HAP are determined by its commissioners. This includes salaries, vacation periods, working hours, rates of pay, etc. The application forms pro-

vided to prospective employees of HAP make no mention of the United States or of any federal agency. The checks with which these employees are paid are not Treasury checks and they make no mention of the United States or of any federal agency. The employees of HAP normally receive their pay from funds obtained by HAP from rental payments by its tenants and this was the source of their pay in May, 1948. The employees of HAP take no oath of loyalty to the United States. They do not have civil service status under the rules and regulations of the United States Civil Service Commission. They do not participate in the Federal Employees Retirement Plan. Their rates of pay are not affected by general pay increases authorized by Congress for federal employees. The employees of HAP can be and are discharged by the executive director of the authority. They are the beneficiaries of a workmen's compensation arrangement established under Oregon state law. The employees of HAP concerned with maintenance are union members and HAP has a contract with their union. When HAP needs additional help, a HAP representative so advises a union representative and the union selects a man for the employment. The firemen of Vanport were also union members and HAP had a contract with their union. The firemen were selected, however, by HAP and not by the union. Most of the employees of HAP and particularly those connected with the Accounts and Auditing Department and the Maintenance Department work on matters relating to all HAP projects.

19. *Arrangements by the Housing Authority of Portland at Vanport.* Because of its size and importance and because it was located beyond the city limits of Portland, HAP made certain special arrangements in connection with Vanport. Water was provided by wells drilled in the area; a sewage disposal and storm drainage system was installed; electricity and telephone service were furnished under contracts between HAP and the utility companies operating in the Portland area. A system for transporting the residents of Vanport to and from their places of employment was installed by the Portland Traction Company. Police operations were in charge of the sheriff's office of Multnomah County. The sheriff maintained an office at Vanport staffed with approximately twenty-five men. An independent fire department consisting of approximately sixty full-time firemen under the direction of a professional fire fighter was established at Vanport by HAP. HAP also entered into a co-operation agreement with the City of Portland whereby the services of its Fire Department would supplement the services of the Vanport Fire Department should the occasion arise. Elementary schools were established at Vanport pursuant to the school district system of the State of Oregon. The Multnomah County Health Department maintained an office at Vanport for public health purposes and Vanport was provided with hospital facilities. Churches of various denominations had representatives at Vanport. A child care service was established and recreational activities were organized including organized sports and social affairs. Library and gymnasium facilities were made available. The work of HAP at Vanport was under the immediate supervision of a full-time project manager. Vanport at one time provided housing for approximately 38,000 persons. As of May 30, 1948, approximately 15,810 persons lived there. A total of 5,270 units were then occupied.

Since Vanport was erected for the specific purpose of providing housing for persons engaged in war industries, it was agreed between FPHA and HAP that the tenants at Vanport should be selected entirely from among such persons. FPHA from time to time and on the advice of the War Manpower Commission and the Army and Navy Departments made available to HAP a list of industries located in the Port-

land area which were considered to be national defense or war industries. After the termination of active war hostilities, Vanport housing was made available for veterans and their families and as of May 30, 1948, a large portion of the residents of Vanport were veterans. As of May 30, 1948, the residents of Vanport were engaged in ordinary civilian occupations and Vanport was being operated to provide low rent housing in the Portland area.

The selection of the individual tenants at Vanport was made by HAP in accordance with the requirements of Manual of Policy and Procedure. Neither the United States nor any Federal agency or employee participated in the selection or identification of the tenants which came within the classifications set forth in the Manual. HAP defined and from time to time redefined with the approval of FPHA the rents which were to be charged for the occupancy of the Vanport premises.

The tenants at Vanport occupied the dwelling units there available pursuant to a revocable use permit in a form prepared by the lawyer for HAP and approved by FPHA. This revocable use permit named HAP as landlord and made no reference to the United States or to any Federal agency. It did, however, conclude with the following language.

"No member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this permit or to any benefit to arise thereupon."

This form of use permit was in effect on May 30, 1948, and all tenants then at Vanport and lawfully in possession of dwelling units held those units pursuant to such a permit. For a period immediately after the war housing projects in the Portland area were first completed, tenants held their premises pursuant to a form of use permit which named the United States as lessor. This form of permit, however, was replaced after the execution of the master lease of February 17, 1944. Those tenants made their rental arrangements with, paid their rent to and conducted all negotiations in connection with the occupancy of their dwelling units with representatives of HAP.

20. *River Stage Forecasts for May and June, 1948.* The United States Weather Bureau began predicting river stages at Portland on May 1, 1948. With a few exceptions a forecast was made each day as to river stage for each of the succeeding four days. The forecasts thus made by the Weather Bureau between May 10, 1948, and June 10, 1948, adjusted to mean sea level, are tabulated below. The actual river stage on the days indicated appear in parentheses. The flood stages were measured at and forecast for the Vancouver, Washington gauge rather than Vanport. However, water levels at Vanport and water levels at Vancouver, Washington, gauge are normally the same.

These forecasts were provided by the United States Weather Bureau to the Corps of Engineers. They appeared day by day in the daily newspapers published in Portland and they were announced over the radio. They were also available at the Weather Bureau office in Portland to anyone who cared to inquire.

## Actual and Forecasted Stages of Columbia River at Vancouver (Weather Bureau Gage) as Converted to Mean Sea Level (1929 Adjustment)

| Date of forecast (actual) | Forecast for (actual) | Forecast for (actual) | Forecast for (actual) | Forecast for (actual) |
|---|---|---|---|---|
| May 10 (15.24) | May 11 15.84 (15.84) | May 12 16.54 (16.54) | May 13 17.04 (16.54) | May 14 17.54 (16.44) |
| 11 (15.84) | 12 16.54 (16.54) | 13 17.04 (16.54) | 14 17.34 (16.44) | 15 17.54 (16.24) |
| 12 (16.54) | 13 16.84 (16.54) | 14 16.54 (16.44) | 15 16.24 (16.24) | 16 16.24 (16.64) |
| 13 (16.54) | 14 16.24 (16.44) | 15 16.04 (16.24) | 16 15.74 (16.64) | 17 16.74 (17.04) |
| 14 (16.44) | 15 16.24 (16.24) | 16 16.24 (16.64) | 17 17.24 (17.04) | 18 17.44 (17.04) |
| 15 (16.24) | 16 16.24 (16.64) | 17 17.24 (17.04) | 18 17.44 (17.04) | 19 17.44 (17.34) |
| 16 (16.64) | 17 17.24 (17.04) | 18 17.24 (17.04) | 19 17.44 (17.34) | 20 17.64 (17.94) |
| 17 (17.04) | 18 17.24 (17.04) | 19 17.24 (17.34) | 20 17.44 (17.94) | 21 17.74 (18.94) |
| 18 (17.04) | 19 17.24 (17.34) | 20 17.54 (17.94) | 21 18.04 (18.94) | 22 18.24 (20.44) |
| 19 (17.34) | 20 17.74 (17.94) | 21 18.44 (18.94) | 22 18.84 (20.44) | 23 19.14 (21.84) |
| 20 (17.94) | 21 18.64 (18.94) | 22 19.34 (20.44) | 23 20.04 (21.84) | 24 20.44 (23.34) |
| 21 (18.94) | 22 19.64 (20.44) | 23 20.94 (21.84) | 24 21.74 (23.34) | 25 22.44 (24.94) |
| 22 (20.44) | 23 21.84 (21.84) | 24 22.64 (23.34) | 25 23.54 (24.94) | 26 24.04 (25.64) |
| 23 (21.84) | 24 22.94 (23.34) | 25 23.94 (24.94) | 26 25.54 (25.64) | 27 26.24 (26.54) |
| 24 (23.34) | 25 24.84 (24.94) | 26 25.34 (25.64) | 27 25.04 (26.54) | 28 24.64 (27.64) |
| 25 (24.94) | 26 25.54 (25.64) | 27 25.34 (26.54) | 28 25.34 (27.64) | 29 25.54 (28.94) |
| 26 (25.64) | 27 25.74 (26.54) | 28 26.34 (27.64) | 29 27.04 (28.94) | 30 27.84 (30.64) |
| 27 (26.54) | 28 27.74 (27.64) | 29 28.74 (28.94) | 30 29.94 (30.64) | 31 30.94 (31.54) |
| 28 (27.64) | 29 29.04 (28.94) | 30 30.24 (30.64) | 31 31.44 (31.54) | June 1 32.24 (32.24) |
| 29 (28.94) | 30 30.24 (30.64) | 31 31.64 (31.54) | June 1 32.24 (32.24) | 2 32.74 (32.14) |
| 30 (30.64) | 31 32.14 (31.54) | June 1 33.34 (32.24) | 2 33.34 (32.14) | 3 32.94 (31.94) |
| 31 (31.54) | June 1 33.24 (32.24) | 2 31.04 (32.14) | 3 31.24 (31.94) | 4 30.74 (31.84) |
| June 1 (32.24) | 2 32.24 (32.14) | 3 31.24 (31.94) | 4 30.74 (31.84) | 5 30.24 (31.94) |
| 2 (32.14) | 3 31.54 (31.94) | 4 31.14 (31.84) | 5 30.94 (31.94) | 6 31.24 (32.24) |
| 3 (31.94) | 4 31.44 (31.84) | 5 31.14 (31.94) | 6 31.44 (32.24) | 7 31.74 (32.14) |
| 4 (31.84) | 5 31.64 (31.94) | 6 31.74 (32.24) | 7 32.54 (32.14) | 8 33.04 (32.14) |
| 5 (31.94) | 6 32.24 (32.24) | 7 32.24 (32.14) | 8 31.94 (32.14) | 9 31.74 (32.14) |
| 6 (32.24) | 7 32.24 (32.14) | 8 32.04 (32.14) | 9 31.84 (32.14) | 10 31.74 (32.24) |
| 7 (32.14) | 8 31.94 (32.14) | 9 31.74 (32.14) | 10 31.94 (32.24) | 11 31.94 (32.34) |
| 8 (32.14) | 9 32.04 (32.14) | 10 32.14 (32.24) | 11 32.24 (32.34) | 12 32.34 (32.14) |
| 9 (32.14) | 10 32.14 (32.24) | 11 32.24 (32.34) | 12 32.34 (32.14) | 13 32.34 (32.44) |
| 10 (32.24) | 11 32.34 (32.34) | 12 32.14 (32.14) | 13 32.34 (32.44) | 14 32.34 (32.44) |

21. *Flood Crests in Prior Years.* Records are available at Vancouver, Washington, recording flood crests in the Columbia River for the period from 1901 to date. The ten highest flood crests during this period and the date of each are listed below:

| Year | Flood Crest m.s.l. (1929 adjustment) |
|------|--------------------------------------|
| 1948 June 1, 13, 14 | 32.4 |
| 1933 June 19 | 27.7 |
| 1928 May 31 | 27.6 |
| 1921 June 12 | 27.4 |
| 1903 June 16–17 | 27.0 |
| 1916 July 3–6 | 26.7 |
| 1917 June 22 | 26.7 |
| 1913 June 13 | 26.6 |
| 1927 June 18–20 | 26.1 |
| 1922 June 11 | 25.6 |

Records for the Portland gauge on the Willamette River are available for the period from 1876 to date. The ten highest flood crests during this period and the date of each are set forth below together with an indication as to whether the flood was principally in the Willamette or Columbia Rivers.

| Year | Flood Crest m.s.l. (1929 adjustment) | River |
|------|--------------------------------------|-------|
| 1894 June 7 | 34.2 | Columbia |
| 1948 June 1, 14 | 31.1 | Columbia |
| 1876 June 24 | 29.4 | Columbia |
| 1880 July 1–2 | 28.5 | Columbia |
| 1882 June 14–16 | 27.3 | Columbia |
| 1887 June 21 | 26.9 | Columbia |
| 1933 June 13 | 26.0 | Columbia |
| 1928 May 31 | 25.6 | Columbia |
| 1921 June 12–13 | 25.5 | Columbia |
| 1899 June 23 | 25.4 | Columbia |

22. *Rainfall at Vanport in May, 1948.* The rainfall, in inches, at the United States Weather Bureau gauges at Vancouver, Washington, and Portland, Oregon, is set forth below for the period from May 20 to May 31, 1948.

| Date | Vancouver | Portland (Airport) |
|------|-----------|--------------------|
| May 20 | 0.00 | 0.00 |
| May 21 | 0.00 | 0.00 |
| May 22 | 0.00 | 0.00 |
| May 23 | 0.00 | 0.00 |
| May 24 | 0.00 | 0.00 |
| May 25 | 0.00 | 0.00 |
| May 26 | 0.00 | 0.00 |
| May 27 | 0.16 | 0.49 |
| May 28 | 0.71 | 0.49 |
| May 29 | 0.07 | 0.00 |
| May 30 | 0.00 | 0.00 |
| May 31 | 0.00 | 0.00 |

Vanport is located in the same area as the Portland Airport and Vancouver rain gauges and receives approximately the same amount of rainfall. The observation time at Vancouver is 5:00 p.m. each day. At the Portland Airport the observation time is midnight. This accounts for most of the difference in the values recorded above.

23. *The Flood Fight: The Persons Participating.* During May and June, 1948, the following public or private agencies were actively engaged in the Vanport flood fight or disaster relief:

(a) The State of Oregon and its agencies
(b) The County of Multnomah and its agencies
(c) The American National Red Cross
(d) The Housing Authority of Portland
(e) The United States Army Engineers
(f) Property owners in the Vanport area
(g) Peninsula Drainage District No. 1.

The Sixth Army of the United States participated to the extent of ordering soldiers into Peninsula Drainage District No. 2 to work on the levees surrounding that district and particularly the river front levee. The United States Coast Guard was alerted to assist in patrolling the river and, as has already been indicated, the United States Weather Bureau made forecasts of river stages.

24. *The Flood Fight: The State of Oregon and Its Agencies.* In 1946 at the suggestion of Red Cross, Mr. Jack R. Hayes, State Disaster Coordinator for the State of Oregon, received instructions from the

Governor of Oregon to collaborate with other Oregon officials in the preparation and distribution of a plan for disaster operations. This plan was prepared. Late in 1947 it was distributed to agencies of the State of Oregon, to each Oregon city and county and to each county chapter of Red Cross.

On April 20, and 21, 1948, Red Cross called, and in cooperation with the State of Oregon, conducted a two-day disaster conference at the state capitol in Salem, Oregon. The conference was attended by representative of Red Cross, by representatives of the state agencies who were mentioned in the disaster plan, by Mr. Hayes as disaster coordinator, and by representatives of United States Coast Guard, the Corps of Engineers, the Sixth Army and the Weather Bureau. The conference discussed in general terms problems of disaster and disaster relief.

On Thursday, May 27, 1948, Mr. Hayes, as Oregon Disaster Coordinator and as representative of the Governor of Oregon, was notified by Red Cross that backwaters from the Columbia River were flooding the Willamette River and that evacuation might be required in low areas in Portland. Red Cross asked that the Portland Armory be made available for use as a shelter center should the occasion arise. Mr. Hayes arranged with the Oregon National Guard for immediate opening of the armory for shelter purposes and he alerted Oregon State agencies in accordance with the Oregon disaster plan.

During Friday, May 28, Mr. Hayes, in Salem, kept in touch with the high water situation by telephone communication to the office of the Sheriff of Multnomah County in Portland. Mr. Hayes also communicated from time to time throughout the day with Red Cross officials in Portland. Friday evening these officials suggested that Mr. Hayes come to Portland to attend meetings to be held in Portland during Saturday, May 29. During Friday the Oregon National Guard mobilized and moved four dukws to the Portland Army Base.

During Saturday morning, May 29, Mr. Hayes attended and participated in meetings with Red Cross officials, held at Red Cross headquarters in Portland, at which the high water situation and plans for disaster relief were reviewed. On Saturday afternoon he attended and participated in the meeting called by Red Cross and held at Red Cross headquarters at which it was decided to distribute a circular to the residents of Vanport. Mr. Hayes returned to Salem Saturday evening.

On Sunday, May 30, Red Cross officials suggested to Mr. Hayes that he return to Portland to participate in a conference which was to be held at 4:00 or 4:30 p. m. at the office of the Army Engineers. Word was received at this conference that Vanport had been flooded. Mr. Hayes immediately called the Governor of Oregon who immediately declared a state of limited emergency. The Oregon National Guard was mobilized and directed to provide relief assistance. Among other things, the National Guard placed its dukws in immediate operation at Vanport to assist in the evacuation of persons and property from the area. Late Sunday evening a conference was held between Mr. Hayes as representative of the Governor of Oregon, the Sheriff of Multnomah County, the liaison officer of the Sixth Army, the Commander of the Oregon National Guard and the Oregon State Police, the Mayor of Portland and representatives of Red Cross. Plans were made to provide relief for Vanport evacuees and to police the Vanport area.

On Monday, May 31, the Governor of Oregon ordered the Oregon National Guard to evacuate, forcibly if necessary, persons living in Peninsula Drainage District No. 2. The evacuation took place as ordered.

Following the Sunday evening conference, the Vanport area was placed in charge of the Oregon National Guard, the Oregon State Police and the Sheriff of Multnomah County. These organizations patrolled the perimeter of the area with armed guards. They also operated boats in the area. In order to prevent looting they denied access to the area to all unauthorized persons.

These organizations continued in charge of Vanport until 6:00 a. m. on June 5, 1948, when the Sheriff of Multnomah County assumed full responsibility for the area.

In addition to those already mentioned, other agencies of the State of Oregon were active either in assisting in the evacuation of Vanport or in providing relief to the evacuees. Upon the failure of the western embankment, the Oregon State Highway Commission took immediate measures to restore traffic on highways in the Vanport area. The Oregon State Department of Education assisted in a survey of the public school system to locate facilities available for use as emergency shelters. The Oregon State Public Welfare Commission assisted Red Cross in the administration of the Red Cross emergency relief program and cooperated in arranging for the transportation of evacuees to the homes of friends and relatives. The Oregon State Board of Health undertook to provide free medical service to evacuees located in public shelters and special preparations were made to check any epidemic which might threaten evacuees.

25. *The Flood Fight: Multnomah County, and Its Agencies.* With the approval of the County Commissioners of Multnomah County Sheriff Martin Pratt of that county established a precinct of his office at Vanport in October, 1942. It was then determined that Oregon law was applicable at Vanport, even though the property was owned by the United States, and that the Multnomah County Sheriff had authority to enforce local laws and to perform ordinary police duties.

In May, 1948, the Vanport precinct was in charge of Captain Mearl C. Tillman. At that time there were twenty-two deputy sheriffs assigned to the precinct. The equipment assigned there consisted of three or four cars equipped with sirens and two-way radios and three motorcycles, also equipped with sirens. The office was open and operating 24 hours a day.

Beginning a week or ten days prior to May 30, 1948, and continuously thereafter the Vanport precinct of the sheriff's office made regular patrols of the embankments surrounding Vanport. These patrols were made by automobile and they were so arranged that each hour a patrol car drove along the Vanport roads paralleling each of the protective embankments. The patrol cars were equipped with spotlights for night use. Two deputy sheriffs were assigned to each patrol car. They had instructions to investigate on foot anything unusual which they learned of or observed in the course of their patrols and to report to the Vanport precinct office. Upon the receipt of such reports and if the situation appeared to warrant it, a further investigation was made by the sheriff's office.

During the period of high water and prior to the failure of the western embankment, the sheriff's office at Vanport received numerous telephone inquiries from residents of Vanport concerning the high water situation and the safety of Vanport. An average of three or four such inquiries were received each hour and on occasion they were much more frequent. The sheriff's office also received inquiries from residents of Vanport who called in person at the precinct office. In addition, the deputies in making their rounds were asked questions by Vanport residents.

The response of the representatives of the sheriff's office to these inquiries was generally to the effect that Vanport was not or did not appear to be in danger.

During the high water period Sheriff Pratt kept the County Commissioners informed in an informal fashion on the general situation and he was in frequent communication with Mr. Hayes of the Governor's office. The sheriff's office of Multnomah County in May, 1948, had 300 reserve officers organized into companies. Company H was called into service at Vanport prior to the failure of the western embankment.

During the period from the failure of the western embankment on May 30 until Monday night, May 31, the sheriff's office with the assistance of the Oregon State Police and the Oregon National Guard was in charge of the Vanport area. From Monday

night, May 31, until June 5, the area was in charge of the Oregon State Police and the Oregon National Guard. At 6:00 a. m. on June 5 the sheriff's office resumed charge. The sheriff's office remained in charge in the Vanport area until a private salvage company began operations sometime in September or October, 1948.

The men who patroled and guarded the Vanport area during this period from June 5 to September or October, 1948, were deputy sheriffs receiving their instructions from and reporting to Captain Tillman. They were paid by the Housing Authority of Portland. Arrangements were made during the period following May 30, 1948, by which former residents of Vanport could go into the area to search for their property. A pass system was established by the sheriff's office and passes were issued by that office. Any person who could identify himself to the satisfaction of the sheriff's office as a former resident of the area, or who was already known to the sheriff's office as a Vanport resident, was given a pass. No person without a pass was allowed to enter the Vanport area. The purpose of the patrol and guard system was to prevent looting.

During the period following May 30, 1948, the sheriff's office cooperated with the Housing Authority of Portland in conducting salvage operations. All property which was not salvaged by individual residents was turned over to the Housing Authority of Portland. The Housing Authority in turn surrendered salvaged property to its owners upon proper identification. Many months later the salvaged property which had not as yet been claimed by the residents of Vanport was sold by the Housing Authority of Portland at public auction.

26. *The Flood Fight: The American National Red Cross.* The American National Red Cross, organized by an act of Congress, 36 U.S.C.A. §§ 1–16, has as one of its statutory purposes "to continue and carry on a system of national and international relief in time of peace and apply the same in mitigating the sufferings caused by pestilence, famine, fire, floods, and other great national calamities, and to devise and carry on measures for preventing the same."

The Oregon Disaster Plan was prepared at the suggestion of Red Cross. The Disaster Conference on April 20 and 21, 1948, at the Oregon state capitol in Salem was called by Red Cross officials. Among the Red Cross representatives who attended that conference was Mr. Edward A. Valentine of Portland, Oregon, who in 1948 and thereafter was chairman of the Disaster Committee for the Portland-Multnomah County Chapter of Red Cross.

The high water in the Columbia River during May and June, 1948, created emergency situations and relief problems all along the river. To deal with these problems Red Cross mobilized more than 3,000 persons and expended several million dollars.

On Wednesday, May 26, the Disaster Committee of the Portland Chapter of Red Cross held a meeting in Portland. The subcommittees of that committee, including those having to do with survey, rescue, medical, nursing, shelter, food and supply, clothing, transportation and warehousing, communications, and radio and information problems were alerted and requested to be ready for mobilization if the occasion arose. On Wednesday Red Cross representatives communicated with the Mayor of Portland and the Multnomah County Sheriff concerning flood conditions. Wednesday evening the amateur radio operators associated with Red Cross were alerted and requested to have their mobile units ready for operation. During Wednesday night Red Cross received several calls for assistance which it processed in regular course.

On Thursday, May 27, Mr. Valentine reviewed the high water situation with Colonel Elligett of the Corps of Engineers and members of his staff. The review was general and there was no particular discussion of Vanport. On that day Mr. Valentine telephoned to Mr. Richard Gordon, Pacific Area Director of Disaster Services for Red Cross, who was located in San Francisco. It was decided that Mr. Gordon and mem-

bers of his staff should come to Portland. During Thursday contacts were made with Mr. Hayes, representing the Governor of Oregon, and with the Coast Guard. The various disaster subcommittees were built up and mobilized.

On Friday, May 28, Mr. Gordon and members of his staff, about fifty persons in all, arrived in Portland to assist with flood problems. The disaster subcommittees and the various volunteer services of Red Cross were put on a 24-hour day basis. Supplies were assembled and during the course of the day a number of families were evacuated from areas along the Willamette River. On Friday evening Mr. Valentine called Mr. Hayes, the Oregon State Disaster Coordinator, and suggested that Mr. Hayes come to Portland to attend meetings which were scheduled for the next day.

On Saturday morning, May 29, Red Cross officials met with Mr. Hayes at Red Cross Headquarters. On Saturday afternoon the Red Cross called a second meeting which was held at the Red Cross Chapter House in Portland. The persons attending the meeting included Mr. Hayes, the Disaster Coordinator, Mr. Harold I. Berentson, Red Cross Chapter Manager, Mr. Richard Gordon, Red Cross Area Director of Disaster Services for the Pacific Area, Mr. L. K. Greer, in charge of food for Red Cross, Mr. Clarence Oliver, in charge of shelter for Red Cross, Mr. Adolph Weinzerl, Chief Medical Officer for the local Red Cross Chapter, Mr. E. C. Lesser and Mr. Clyde A. Warren, of the Local Red Cross Disaster Committee, Mr. Tom West, chairman of the Multnomah County Board of County Commissioners, Mr. Martin Pratt, the Multnomah County Sheriff, Mr. Ard Pratt, a deputy sheriff, Mr. Tom Ward of the Housing Authority of Portland and a nurse representing the Multnomah County Health Office. No representative of the Corps of Engineers attended this meeting. It was at this meeting that the decision was made to distribute a circular to the residents of Vanport.

On Sunday afternoon, May 30, a meeting was held in the office of the Corps of Engineers in Portland. The meeting was at-tended by Mr. Gordon and Mr. Valentine for Red Cross, by General Swift, representing the commanding general of the Sixth Army, and by Colonel Weaver, Colonel Walsh, and Colonel Elligett of the Corps of Engineers. This meeting was interrupted by news that the western embankment at Vanport had failed.

During the night of May 30 and thereafter Red Cross provided housing and food to evacuees from the Vanport area. Red Cross also provided relief payments to flood victims in Multnomah County in the total amount of $2,012,469.70, part of which went to residents of Vanport. These relief payments, which were gifts, were for food, clothing, tools and other necessities required to permit the flood victims to re-establish themselves. Loans were available to flood victims from the United States acting through the Reconstruction Finance Corporation and the Department of Agriculture.

During the high water period Red Cross received information as to conditions in the Vanport area from a Red Cross surveyor equipped with radio communication and assigned to Peninsula Drainage Districts Nos. 1 and 2 and from about fifty amateur radio operators who were operating mobile units in the flood area. Red Cross during this period was in communication with representatives of the Sheriff of Multnomah County and with Mr. Hayes as a representative of the Governor of Oregon. The contracts between the Red Cross and the Army Engineers have been described.

At the time of the failure of the western embankment at Vanport on May 30, 1948, Red Cross had approximately three thousand persons mobilized for or actually participating in relief duties in connection with the Columbia River flood.

27. *The Flood Fight; Holders of Property in Peninsula Drainage District No. 1.* During the high water period and prior to the failure of the western embankment on May 30, 1948, various organizations owning or holding property in the Vanport area provided work crews and materials to the extent required for work on the embankments surrounding Vanport. Such crews

were provided by the Spokane, Portland & Seattle Railway Company, the Union Pacific Railroad Company, Swift & Company, Western Waxed Paper Company, the Portland Union Stockyards and the Housing Authority of Portland. This was done pursuant to an understanding which was reached at a meeting held in the office of Mr. W. A. Williams, president of the Portland Union Stockyards, on Wednesday, May 26. Persons present at the meeting, in addition to Mr. Williams, who presided, were Mr. Arthur Tims, president of Peninsula Drainage District No. 1, and Mr. John Suttle, engineer for the District, a Mr. Justus, representing Swift & Company, Mr. C. L. Dilling, representing Western Waxed Paper Company, Mr. John Gantenbein, representing the Oregonian, a Mr. Nance, a tenant of Portland Union Stockyards, and Messrs. Harry Freeman, Harry Jaeger, Roy Taylor and John Ward, representing the Housing Authority of Portland. Mr. Roger Spalding, a field representative of Federal Public Housing Authority, attended but did not participate in the meeting. No representative of the Corps of Engineers was present at the meeting.

At this meeting there was a general review of the flood situation. It was also agreed that the organizations represented at the meeting and active in the flood fight would co-operate with each other, each spending such sums as might be required, and that thereafter there would be a proration of the total expense on a reasonable basis. A committee consisting of Messrs. Suttle, Dilling, and Jaeger was appointed with authority to pass on and approve any major expense which might be incurred and which would thereafter be subject to proration. An agreement expressing this understanding for proration of the expense of the flood fight was thereafter circulated and signed.

On Friday, May 28, a second meeting was held in the office of Mr. Williams, the president of Portland Union Stockyards. The persons present at this meeting were more or less the same persons who were present at the Wednesday meeting and represented more or less the same interests, except, however, that at the Friday meeting no representative of Federal Public Housing Authority was present. On this occasion there was another general review of the flood situation and the measures which had been adopted in that connection. No representative of the Corps of Engineers attended this meeting.

Neither at the Wednesday meeting nor at the Friday meeting was there any suggestion that the embankments surrounding Peninsula Drainage District No. 1 were not adequate to withstand the pressure of the flood waters nor was there any suggestion that Vanport was in danger. There was no discussion or suggestion at either meeting of evacuation of Vanport. Nor was there any suggestion that the measures taken in connection with the flood fight were not adequate for that purpose.

28. *The Failure of the Western Embankment.* The western embankment protecting Vanport, consisting of the two railroad fills and the highway fill together constituting a single structure, failed under the pressure of flood waters between 4:00 and 4:30 p. m. on May 30, 1948. Representatives of the Sheriff's office, of the Housing Authority of Portland and of the Vanport Fire Department happened to witness the failure. They reported immediately to their respective offices. The representatives of the sheriff's office immediately manned their equipment, consisting of patrol cars and motorcycles equipped with sirens, and circulated through Vanport operating their sirens and giving the alarm. Three engines of the Vanport Fire Department also circulated immediately through Vanport with their sirens operating. Arrangements had earlier been made by the Housing Authority of Portland to have a sound truck stationed at the administration building in Vanport. Upon receipt of information by telephone at the administration building that the western embankment had failed, this sound truck immediately began circulating through the area giving the warning and providing instructions as to evacuation. At the same time the siren located on the administration building together with the air raid horn (which had been installed as an air raid protective device for Vanport during the war) were placed in operation.

They continued to operate for several minutes until the Vanport power failed.

The water, as it entered Vanport, first filled the sloughs and drainage system of the Vanport area. It then advanced eastward, spreading out across the entire area of Peninsula Drainage District No. 1. The water advanced across Vanport approximately at the rate at which a person walks. Witnesses to the flooding of Vanport estimate the time which was required to fill the Vanport area as between 45 and 75 minutes.

29. *The Extent of the Flood Fight.* The flood fight at Peninsula Drainage District No. 1 was part of the flood fight conducted during May and June 1948 all along the Columbia River and its tributaries. More than fifty cities and towns, together with suburban and agricultural areas, were affected to a greater or lesser degree by the high water. In Idaho twenty-one cities and towns were threatened by the high water and substantial inundation and damage occurred at Bonners Ferry, St. Maries, Lewiston, Whitebird, Orofino, Stites and Kooskia. In Washington twenty-four cities and towns were threatened and substantial inundation and damage occurred at Omak, Cle Elum, Ellensburg, Yakima, Richland, Kennewick, Pasco, Washougal, Camas, Vancouver, Woodland, Kelso and Longview. In Oregon twelve cities and towns were threatened and substantial inundation and damage occurred at Union, Umatilla, The Dalles, Bonneville, Vanport, Portland, St. Helens and Rainier. The flood rendered more than 70,000 persons homeless and over 5,000 homes were destroyed. More than 400,000 acres were inundated by flood waters; forty-one persons lost their lives; and property damage has been estimated at more than $100,000,-000.

The flood fight involved 475 miles of levees protecting approximately 200,000 acres of land. On the lower Columbia, sixty-one drainage and diking districts, including Peninsula Drainage District No. 1, were affected. The problems which developed in the drainage and diking dis-

tricts included levee settlement, boils, excessive seepage, levees of inadequate height, rodent borings and in some cases actual failures. During the high water period on the lower Columbia more than 10,000 persons, including about 1,200 Army troops, Navy personnel, National Guard troops and members of the Coast Guard participated in the flood fight. The Governors of Idaho, Washington and Oregon declared states of emergency.

The Corps of Engineers made the following assignments of field personnel in connection with the flood fight on the dates indicated:

| On | To |
| --- | --- |
| April 20 | Heise-Roberts Area, Idaho |
| May 20 | Bonners Ferry, Idaho |
| May 23 | St. Maries, Idaho |
| May 25 | Omak, Washington |
| May 25 | Yakima, Washington |
| May 26 | Spokane, Washington |
| May 27 | Troy, Montana |
| May 28 | Libby, Montana |
| May 28 | Cle Elum, Washington |
| May 29 | Ellensburg, Washington |
| May 29 | Lewiston, Idaho |
| May 29 | Kalispel, Montana |
| May 31 | Cusick, Washington |
| May 27 | Boise, Idaho |
| May 27 | Pasco-Kennewick, Washington |
| May 27 | Umatilla, Oregon |
| May 27 | Multnomah District, Oregon |
| May 27 | Sandy District, Oregon |
| May 27 | Peninsula District No. 1, Oregon |
| May 27 | Peninsula District No. 2, Oregon |
| May 27 | Sauvie Island District, Oregon |
| May 27 | Washougal, Washington |
| May 27 | Woodland, Washington |
| May 27 | Scappoose, Oregon |
| May 27 | Rainier, Oregon |
| May 27 | Kelso-Longview, Washington |
| May 27 | Wahkiakum District, Washington |
| May 27 | Clatskanie, Oregon |
| May 27 | Beaver District, Oregon |
| May 27 | Deer Island District, Oregon |
| May 27 | Knappa District, Oregon |

On May 27 resident engineers and their assistants at McNary Dam, The Dalles-Celilo Canal, Bonneville Dam and Fort Stevens also began to participate in the flood fight.

30. *Executive Order No. 9957*, U.S. *Code Cong.Service 1948*, p. 2642. On January 16, 1948, three unions of railroad company employees, the Brotherhood of Locomotive Engineers, the Brotherhood of Locomotive Firemen and Enginemen and the Switchmen's Union of North America, issued a strike call for February 1, 1948, in connection with a wage dispute then in progress with representatives of the railway carriers. On January 27, 1948, the president, pursuant to Section 10 of the Railway Labor Act, 45 U.S.C.A. § 160, issued Executive Order No. 9929, U.S.Code Cong.Service 1948, p. 2622, creating an Emergency Board to investigate the wage dispute. On March 27, 1948, the Board transmitted its report to the President and the report was immediately made public. On March 29, 1948, the carriers advised the President that they were willing to accept the recommendations of the Board. On April 6, 1948, the unions advised the carriers that they declined to accept those recommendations. Thereafter a series of conferences were held between the carriers and the unions with the participation of the National Mediation Board. No agreement was reached. On April 30, 1948, the unions notified the carriers that their members would strike at 6:00 a. m. on May 11, 1948.

On May 10, 1948, the President issued Executive Order No. 9957, providing for the operation of the properties of named carriers by the Secretary of the Army, upon the terms specified in the order and subject to the limitations therein contained. The executive order became effective at twelve o'clock noon, May 10, 1948. It named as subject to the order most of the important railway carriers operating within the United States, including the Union Pacific Railroad Company and the Spokane, Portland & Seattle Railway Company and its affiliates, the Oregon Trunk Railway and the Oregon Electric Railway.

On May 10, 1948, the United States District Court for the District of Columbia enjoined the unions from ordering or permitting a strike of their employees. This order of the District Court remained in effect until the labor dispute was settled and the operation of their properties returned to the carriers.

The Chief of Transportation of the Department of the Army, an agency of the United States, was designated by the Secretary of the Army as the agent responsible for the implementation of all Department of the Army action where the primary mission was technical assistance in carrying out the duties imposed upon the Department of the Army by Executive Order No. 9957. For administrative purposes in performing its duties under the executive order, the Department of the Army divided the United States into seven geographic regions and over each named an army officer as director. These directors in each instance were well-known railroad executives who were either commissioned in the Army or recalled to active service for the purpose of assisting the Army in carrying out the provisions of Executive Order No. 9957. Department of the Army representatives, each subject to the command of the appropriate regional director, were sent by the Army to the operating headquarters of each of the railroad companies named in the executive order.

In accordance with this program the Department of the Army sent three officers, a captain and two assistants, to the Portland offices of the Seattle, Portland & Spokane Railway Company on or about May 10, 1948. The army officers did not participate in any way in the management of the railroad company or its affiliates. Their activities were confined entirely to sending daily reports to the appropriate army regional director, calling to his attention anything unusual in the operation of the railroad during the preceding day and otherwise simply noting that operations were normal. The army officers

received their information either from the general manager or the general superintendent of the railroad company. These army representatives did not participate in any way in the Vanport flood fight or in anything which the railroad company did or did not do in that connection.

In similar fashion three army representatives were sent to the Portland office of the Union Pacific Railroad Company. They did not participate, however, in the management of the Portland office of the company and the company received no suggestions or instructions from the Army representatives concerning the Vanport flood fight. The Army representatives did not participate in any way in what the Union Pacific Railroad Company did or did not do in that connection.

The Spokane, Portland & Seattle Railway Company posted a notice at various locations on company properties advising company employees of Executive Order No. 9957. Some of the employees of the railroad companies saw the posted notices; others learned of the executive order from newspaper reports; still others did not at any time learn of the executive order or the activities of the United States in that connection. The Portland office of the Union Pacific Railroad Company posted no such notices but some of its Portland employees learned of the executive order from other sources.

The activities of the United States pursuant to Executive Order No. 9957 did not require the railroad companies to, nor did the railroad companies, in fact, alter their normal course of conduct in relation to their employees. The duties, responsibilities, methods and sources of pay and methods and sources of instruction of the employees of the railroad companies were unaffected by Executive Order No. 9957. The employees of the railroad companies did not, upon the issuance of Executive Order No. 9957, take an oath of loyalty to the United States; they did not acquire civil service status under the rules and regulations of the United States Civil Service Commission; they did not participate in the Federal Employees Retirement Plan; they did not receive the customary rates of pay for government employees; they were not paid from funds belonging to the United States or any agency of the United States and their pay checks made no mention of the United States or any agency of the United States. During the period Executive Order No. 9957 remained effective, the employees of the railroad companies received no instructions or suggestions from the United States or any agency or employee of the United States unless, as plaintiffs contend and defendant denies, the railroad companies themselves became agencies of the United States as a result of Executive Order No. 9957.

The Department of the Army issued to the carriers four general orders during the period of government operation. The first, dated May 10, 1948, advised the carriers of the action of the United States District Court for the District of Columbia, enjoining the strike. The second, dated May 11, 1948, directed the cancellation of the outstanding embargoes on the movement of perishables and livestock issued in anticipation of the strike. The third, dated May 13, 1948 provided in general terms that the carriers should comply with all applicable regulations of governmental authorities. The fourth dated May 17, 1948, referred to the regional administration which had been established, to the operation of the transportation systems by existing managements and to the fact that the carriers would remain subject to suit as in the period prior to government operation and control.

The negotiations between the carriers and the unions continued during May and June, 1948, and on 'July 8, 1948, a settlement of the wage dispute was agreed upon. On July 9, 1948, at 4:00 p. m. the United States terminated its activities under Executive Order No. 9957. The railroad companies entered into agreements with the United States whereby, among other things, the United States waived any right it might have to an accounting from

the carriers, and the carriers in turn undertook certain obligations to indemnify the United States.

30. *Identification of Individuals: Corps of Engineers.* With respect to the Corps of Engineers during the flood period of May, 1948, the following is a list of individuals with their respective titles and duties:

(a) Col. Theron D. Weaver, Colonel, U. S. Army, Division Engineer in charge of North Pacific Division of the Corps of Engineers;

(b) Col. Orville E. Walsh, Colonel, U. S. Army, District Engineer in charge of the Portland District of the Corps of Engineers under the North Pacific Division;

(c) Robert E. Hickson, Civil Engineer, Chief, Engineering Division, Portland District in charge of all engineering matters including the designing, planning and construction of river and harbor and flood control works within the jurisdiction of the District Engineer;

(d) Theron W. Ragsdale, Civil Engineer, Chief, Operations Division in charge of all construction operation and maintenance of river and harbor and flood control works in the Portland District;

(e) Frank C. Linton, Civil Engineer, Assistant Chief of Operations Division, Portland District, to assist and carry on the duties of the Chief of Division in his absence;

(f) Otto C. Hartman, Civil Engineer, Chief, Construction Branch, Portland District, responsible for prosecution and technical administration of all new construction within the Portland District including several major multi-purpose dams and minor flood control projects;

(g) Harry K. Doyle, Civil Engineer in charge of Miscellaneous River and Harbor and Flood Control Section, directs the work of the section as senior engineer in charge;

(h) Seth F. Michael, Civil Engineer in charge of Columbia and Lower Willamette Rivers maintenance; inspects water control structures, directs construction and maintenance of bank protection works, plans, schedules and directs rectification, deepening and diversion of river channels, investigates complaints regarding erosion of banks;

(i) Kenneth R. Dibblee, Civil Engineer, Assistant to the Chief, Construction Branch, Operations Division, Portland District; reviews work of section heads and acts on own initiative in the absence of a Chief of Branch.

As of January, 1951, the titles and whereabouts of the above enumerated individuals are as follows:

(a) Col. Theron D. Weaver, now employed by the Corps of Engineers on overseas duty;

(b) Col. Orville E. Walsh, Brigadier General, Division Engineer in charge of the North Pacific Division, Corps of Engineers;

(c) Robert E. Hickson, same duty and title as in May, 1948.

(d) Theron W. Ragsdale, Chief of Operations and Construction Division, Portland District;

(e) Frank C. Linton, Assistant to Mr. Ragsdale;

(f) Otto C. Hartman, Construction Engineer (general) and Chief, Supervision and Inspection Branch, Construction Division, Portland District;

(g) Harry K. Doyle, Civil Engineer and Chief, Operations and Maintenance Branch, Operations Division, Portland District.

(h) Seth F. Michael, deceased.

(i) Kenneth R. Dibblee, Construction Management Engineer, Chief, Service Branch, Construction and Operations Division, Portland District.

31. *Identification of Individuals: Housing Authority of Portland.*

During the flood period of May, 1948, the principal personnel of Housing Authority of Portland, together with a statement of titles and duties, was as follows:

(a) Harry D. Freeman, Executive Director and Secretary-Treasurer of the Housing Authority of Portland, with general supervision of its activities and employees;

(b) Kenneth Eckert, Management Director of the Housing Authority;

(c) Harry D. Jaeger, Project Manager at Vanport;

(d) Roy Taylor, Assistant Director of Management;

(e) Ernest E. Milliron, electrical supervisor for Housing Authority of Portland and thus responsible for the working of the siren on the Administration Building in Vanport during the flood period, spent most of his time in Vanport proper and he is familiar with the circumstances surrounding the operation of the siren at the exact time of the flood;

(f) Carl W. Tomlinson, an electrician for Housing Authority of Portland, stationed at Vanport, and in actual personal control of the siren on the Administration Building at the moment of the flood;

(g) C. S. McGill, Maintenance Engineer for the Housing Authority, supervision of the skilled crafts, carpenters, plumbers and electricians, thus responsible for the labor and materials used on the dikes during the flood fight;

(h) Ralph B. Schlatter, Head of the Fire and Safety Division of the Housing Authority of Portland, Chief Inspector of Vanport, and formulated the Fire Department patrol system on the dikes and was immediately responsible for such patroling;

(i) Robert N. Maderas, in charge of electrical maintenance on all drainage and sewage pumps in Vanport under the direct supervision of Mr. McGill and in direct charge of Drainage Pumps No. 1 and No. 2 which pumped the water out of the drain ditch running parallel to the railroad fill;

(j) Jack Weber, in charge of surplus property in Vanport;

(k) John L. Ward, Chief of Project Services at Vanport and who attended the Red Cross meeting and prepared the bulletin issued to residents of Vanport.

D. With respect to each of the consolidated cases, plaintiffs contend, and the defendant, the United States, denies:

Contentions of Plaintiffs

a. *In General*

1. That the Court has jurisdiction of these actions;

2. That Section 702c, Title 33 U.S.C.A. is superseded by the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671–2680, and not applicable in any event to the Columbia River Basin;

3. That there was a general housing shortage in and around Portland, Oregon and Vancouver, Washington at all times material to this controversy;

4. That Vanport was a war housing project, as distinguished from a low rent or slum clearance project, as provided in Section 1544, 42 U.S.C.A. and therefore no authority existed by which the relationship of independent contractor or lessor could be created by the United States and Housing Authority of Portland;

5. That the doctrine of res ipsa loquitur applies in these cases because United States owned Vanport and had exclusive control of the railroad fill that failed during the flood period;

6. That the railroad fills bounding Vanport on the west were built in a flood plain over an arm of Smith Lake;

7. That the railroad fills were not constructed for the purpose of becoming water repellent structures;

8. That said railroad fills contained many rotten timbers offering accelerated seepage paths during periods of high water;

9. That said railroad fills had soft bottoms likely to blow out during periods of high water;

10. That said railroad fills, when used as water repellent structures, constituted a continuing nuisance, giving rise to causes of action upon the occurrence of damage;

11. That during the period from 1934 through 1941 United States, acting through the Corps of Engineers, accepted and adopted said railroad fills as water repellent structures when improving Peninsula Drainage District No. 1;

12. That the United States again accepted and adopted said railroad fills as water repellent structures when selecting the site for Vanport in 1942;

13. That by Executive Order No. 9957 under date of May 10, 1948, United States acquired exclusive possession and control of said railroad fills;

14. That the United States, under said Executive Order, took over the operation and management of the Spokane, Portland & Seattle Railway Company and the Union Pacific Railroad Company;

15. That during the flood period of May, 1948 and for many years prior thereto, trees, brush, briars, vines and high grass had been permitted to grow along the Vanport side of said railroad fills preventing visual inspection of seepage spots, boils, saturated areas and subsidence of said railroad fills during periods of high water;

16. That under Title 33, Navigation and Navigable Waters, Chapter Two, Corps of Engineers regulations, part 208, Peninsula Drainage District No. 1 had the obligation, under the supervision of the Corps of Engineers, of removing all such trees, brush, briars, vines and high grass, but failed to do so;

17. That the Corps of Engineers of Portland, Oregon District had the obligation to enforce said regulations, but negligently and carelessly failed to do so, with the result that during the high water period of May, 1948, visual inspection of seepage spots, boils, saturated areas and subsidence of said railroad fills could not be made;

18. That the Corps of Engineers had the duty and responsibility of assisting Peninsula Drainage District No. 1 in carrying out its obligations under said regulations to keep said railroad fills free from trees, shrubs, briars and tall grass, but carelessly and negligently failed to do so.

19. That under said regulations, inspections were required to be made immediately prior to the beginning of each flood season by said Drainage District, with the assistance of said Corps of Engineers, to determine whether or not any dangerous conditions existed in the levees, dikes or structures forming a part of said Drainage District;

20. That the Corps of Engineers negligently and carelessly failed to enforce said regulations immediately prior to the flood season of May, 1948;

21. That under said regulations, during flood periods, said railroad fills and the levees protecting Vanport were to be patrolled continuously to locate possible boils or unusual wetness on the landward slopes and to be certain that there was no indication of conditions which might endanger said structures;

22. That the Corps of Engineers of the United States negligently failed and neglected to enforce said regulations;

23. That under said regulations, appropriate advance measures were to be taken to assure the availability of adequate labor and materials to meet all contingencies in a flood fight, and the Corps of Engineers of the defendant negligently failed to enforce said regulation;

24. That the United States owned 80% of the land in Peninsula Drainage District No. 1 during the flood period of May, 1948;

25. That the United States, acting through Federal Public Housing Authority, acquired the pump house, pumps and discharge lines, and all electrical equipment in connection therewith, formerly used by Peninsula Drainage District No. 1 in the maintenance of said District, by agreement dated April 29, 1944 and was responsible for the operation thereof during the flood period of May, 1948;

26. That Housing Authority of Portland was organized, pursuant to an Enabling Act of the Oregon State Legislature, for the purpose of becoming, among other things, an agent of the United States in the management of Housing Projects;

27. That the master lease between Housing Authority of Portland and the United States, was a property management agreement only, under which the United States was principal and Housing Authority of Portland was agent;

380

28. That the entire management of Vanport was regulated by a Manual of Policy Procedure, issued by Federal Housing Authority officials;

29. That said Manual of Policy and Procedure was continuously supplemented by written instructions, releases and verbal orders by Federal Housing officials;

30. That Housing Authority of Portland was a Federal agency in the management and control of Vanport under the provisions of the Federal Tort Claims Act;

31. That Housing Authority of Portland acted at all material times in an official capacity for the United States in the operation, management and control of Vanport;

32. That during the flood period of May, 1948, Housing Authority of Portland acted in an official capacity for and on behalf of the United States in the flood fight;

33. That the United States owned Vanport and that the plaintiffs were tenants of the United States;

34. That the law of the State of Oregon applicable to the relationship of landlord and tenant applies between each of the plaintiffs and the United States;

35. That it was the duty of the United States as such landlord to warn plaintiffs of any latent defects in the premises during the flood period of May, 1948;

36. That it was the duty of the United States, as such landlord, to give plaintiffs timely warning of dangers to life and property by flood on or before May 30, 1948;

37. That plaintiffs were inexperienced respecting floods;

38. That plaintiffs and each of them relied on statements with regard to the safety of their property and lives made by the personnel in the Corps of Engineers and Housing Authority of Portland;

39. That plaintiffs did not assume the responsibility or risk of deciding that they were safe or unsafe during the flood period;

40. That no Act of God was the proximate cause of the damages suffered by plaintiffs.

b. *Negligence of the Housing Authority of Portland:*

41. That the United States was negligent, acting through Housing Authority of Portland, in the following respects:

(a) In failing to warn plaintiffs of latent defects in the Premises;

(b) In failing to formulate and carry out a plan of evacuation of plaintiffs;

(c) In advising plaintiffs that dikes were safe on May 29 and May 30, 1948; in advising plaintiffs they would be warned if necessary; in informing plaintiffs they would have time to leave; in instructing plaintiffs to not get excited, by written bulletin at a time when it was known, or should have been known in the exercise of reasonable care, that the flood situation was becoming worse;

(d) In failing, at about noon of May 30, 1948, when advised that the flood situation was critical, of not warning plaintiffs to immediately leave Vanport;

(e) In failing to employ experienced personnel in flood control work and patroling the dike area surrounding Vanport and particularly the railroad fill that failed;

(f) In failing to clear the Vanport side of said railroad fill of trees, brush, shrubs, briars and tall grass during the flood period so that visual inspection could be made of saturated areas, seepage, boils and subsidence;

(g) In failing to co-operate with the American Red Cross, agencies of the State of Oregon and Corps of Engineers in the flood fight;

(h) In failing to collect and disseminate to the Corps of Engineers evidence of seepage, boils, saturated areas and subsidence of said railroad fill;

(i) In failing and neglecting to continuously patrol the Vanport side toe of said railroad fill despite instructions so to do by the Corps of Engineers;

(j) In arbitrarily withholding vital information with respect to danger to Vanport by flood from plaintiffs although plaintiffs continuously sought such information.

c. *Negligence of Corps of Engineers:*

42. That the United States was negligent, acting by and through the Corps of Engineers, Department of the Army, in the following respects:

(a) In failing to protect the lives and property of plaintiffs;

(b) In failing to collect, evaluate and disseminate among the forces of the office of the District Engineer, Portland, Oregon, all available information;

(c) In failing and refusing to warn plaintiffs of danger to their lives and property by flood;

(d) In failing and neglecting to co-operate with the American Red Cross and agencies of the State of Oregon in the evacuation of plaintiffs;

(e) In failing to adequately patrol the railroad fill that failed;

(f) In failing to enforce the existing regulations of the Department of the Army requiring Peninsula Drainage District No. 1 to adequately patrol said railroad fill;

(g) In releasing to plaintiffs false and misleading information with respect to dangers to their lives and property by flood;

(h) In failing to have available in the office or on the staff of the District Engineer, Portland, Oregon, any personnel familiar with the construction, defects in and weakness of the railroad fill that failed on and prior to the flood period of May, 1948;

(i) In the failure and neglect of the personnel of the District Office of the Corps of Engineers to carry out specific orders of the Division Engineer of the North Pacific Division to patrol said railroad fill during the flood period;

(j) In advising Housing Authority of Portland and Peninsula Drainage District No. 1 that there was no necessity for patroling said railroad fill;

(k) In failing to have available in the Portland, Oregon, District adequate and experienced personnel sufficient to enforce Department of the Army regulations with respect to the care, maintenance and operation of Peninsula Drainage District No. 1;

(1) In failing and neglecting to have available in the Portland, Oregon District adequate and experienced personnel sufficient to carry out the duty of collecting, evaluating and disseminating all available flood information and of warning persons, including plaintiffs, in areas about to be damaged by flood of danger to their lives and property, and of assisting in their evacuation.

d. *Knowledge of Railroad Personnel:*

43. That on the 28th day of May, 1948, a large crack about sixty feet in length appeared on the Vanport shoulder of the railroad fill that failed and was observed by personnel of the Spokane, Portland & Seattle Railway Company;

44. That said crack was evidence of subsidence of said railroad fill and an indication of danger;

45. That for several days prior to May 30, 1948, said railroad fill showed evidence of saturation with water and that maintenance work was required constantly to keep the tracks level and the switches in order at the point where said fill failed;

46. That on May 30, 1948, said railroad fill was in such saturated condition that a slow order was necessary reducing the speed of trains to about ten miles per hour when crossing said railroad fill that failed;

47. That the United States was negligent, acting through the Department of the Army, in charge of the operation of said railroad company in not reporting the dangerous condition of said railroad fill to the Corps of Engineers, Housing Authority of Portland and to Plaintiffs;

48. That the knowledge of the personnel of said railroad company was the knowledge of the United States as respects the dangerous conditions existing from May 28 to May 30, 1948 in said railroad fill;

49. That the negligence and omissions of duty of the respective employees of the United States, as hereinabove stated in these contentions, combined to proximately cause the losses and damages suffered by plaintiffs;

382

50. That plaintiffs relied on the assurance of safety hereinabove recited, believed that they were safe in their property and lives, and except for such assurances of safety, plaintiffs would have removed their property from Vanport;

51. That because of the negligence, omissions of duty and wrongful acts of the United States, plaintiffs did not remove their property from Vanport and therefore suffered losses as follows:

| Name | Civil No. | Amount of Loss |
|---|---|---|
| Clark, Solon B. Jr. and Geraldine A. Clark, Husband and Wife v. U.S.A. | 4420 | $5,667.39 |
| LaVigne, Paul L. v. U.S.A. | 4449 | 2,120.00 |
| Lebkisher, C. W. and Virginia v. U.S.A. | 4450 | 6,502.97 |
| Lommasson, Vern W. and Irene v. U.S.A. | 4451 | 2,193.50 |
| Merz, Robert N. and Dolores C. v. U.S.A. | 4468 | 1,956.24 |
| Miller, Herschel J. and Lorene v. U.S.A. | 4469 | 5,390.94 |
| Manning, Levi and Olive v. U.S.A. | 4599 | 2,049.35 |
| Thomas, James D. and Phisford O. Thomas v. U.S.A. | 4607 | 2,328.30 |
| Schook, Donald L. and Dorothy Schook, Husband and Wife, v. U.S.A. | 4775 | 2,928.17 |
| Marlett, Howard N. and Vera Marlett, Husband and Wife v. U.S.A. | 4785 | 4,030.82 |
| Litchfield, Ella G. v. U.S.A. | 4882 | 5,190.00 |
| Smith, Walter D. and Dolores M. Smith, Husband and Wife v. U.S.A. | 4928 | 2,656.00 |
| Schroeder, Herbert Henry and Katherine Starr Schroeder, Husband and Wife v. U.S.A. | 5054 | 5,023.00 |
| Ambrose, Marguerite and LeRoy J. Ambrose, Wife and Husband v. U.S.A. | 5122 | ,4679.00 |
| Bird, Paul H. and Mary A. Bird, Husband and Wife v. U.S.A. | 5469 | 4,297.00 |
| Elliott, John T. and Ethel J. Elliott, Husband and Wife v. U.S.A. | 5475 | 1,395.00 |
| Jones, Milton L. and Barbara J. Jones, Husband and Wife v. U.S.A. | 5484 | 1,926.00 |
| Wild, Stanley M. and Iva M. Wild, Husband and Wife v. U.S.A. | 5498 | 2,531.27 |
| Wilkinson, Howard E. and Eleanor Wilkinson, Husband and Wife v. U.S.A. | 5499 | 2,231.00 |
| Caswell, James Grant and Thelma K. Caswell, Husband and Wife v. U.S.A. | 5532 | 1,471.95 |

52. Assuming, but not conceding, that there was no legal obligation on the United States to warn plaintiffs of danger to their lives and property by flood, United States did, acting through Housing Authority of Portland and the Corps of Engineers, assume such obligation and thereafter negligently failed to discharge such duty to plaintiffs.

E. With respect to each of the plaintiffs and each of the consolidated cases the United States contends and the plaintiffs deny:

Contentions of the United States

a. *Generally:*

1. * * *

2. That the Court has no jurisdiction over this action either under the Federal Tort Claims Act or otherwise;

3. That all damage to plaintiff was caused by an Act of God for which neither the United States nor its agencies or employees is in any way responsible and for which the United States cannot be held liable;

4. That the 1948 Flood fight at Vanport was conducted on a co-operative basis by the State of Oregon and its agencies, the County of Multnomah and its agencies, the American National Red Cross, Peninsula Drainage District No. 1 and persons, including the Housing Authority of Portland, owning or leasing property in the Vanport area;

5. That although representatives of the Corps of Engineers provided advice and assistance to the persons conducting the 1948 Columbia River flood fight neither the United States nor its agencies or employees directed or controlled that flood fight at Vanport;

6. That during the 1948 high water period neither the United States nor its agencies or employees maintained or controlled or was in any way responsible for the condition of the embankments surrounding Vanport;

7. That neither the United States nor its agencies or employees had or assumed any duty whatever to plaintiff during the 1948 high water period;

8. That neither the United States nor its agencies or employees had any duty to order the evacuation of Vanport;

9. That neither the United States nor its agencies or employees had power to order the evacuation of Vanport;

10. That neither the United States nor its agencies or employees had any duty to warn plaintiff about flood conditions or to advise plaintiff as to the safety of his person or property;

11. That neither the United States nor its agencies or employees undertook to warn plaintiff about flood conditions or to advise plaintiff as to the safety of his person or property;

12. That the United States and all of its agencies and employees exercised due care in all matters arising out of or in any way connected with the 1948 high water situation;

13. That the United States cannot be held liable in damages for the negligence or wrongful conduct, if any, of its agencies or employees who attempt to provide assistance to the public in a period of possible public peril;

14. That the United States cannot be held liable in damages for the negligence or wrongful conduct, if any, of its agencies or employees in the course of activities undertaken by them which are beyond the scope of their duties as defined by Congress;

15. That no act or failure to act of the United States or its agencies or employees was the proximate cause of any damage to plaintiff;

16. That all activity of the United States and its agencies and employees in connection with the 1948 Columbia River high water was discretionary activity for which there can be no liability under the Federal Tort Claims Act;

17. That under the provisions of 33 U.S.C.A § 702c the United States cannot be held liable for damage caused by flood waters and the United States therefore cannot be held liable to plaintiff;

18. That 33 U.S.C.A. § 702c is in full force and effect and has not been amended or modified by the Federal Tort Claims Act;

19. That the United States has no police power and was in no way responsible in May 1948 for the safety of plaintiff or

his property or the safety of the persons and property of other residents of Vanport;

20. That neither the United States nor its agencies or employees undertook to be responsible in May 1948 for the safety of plaintiff or his property or the safety of the person and property of other residents of Vanport;

21. That if and to the extent any agency or employee of the United States undertook to direct or control the flood fight at Vanport or to be responsible for the condition of the embankments surrounding Vanport or to assume any duty to plaintiff during the 1948 high water period or to advise plaintiff as to the safety of his person or property, it or he acted beyond the scope of its or his employment;

22. That the liability, if any, of the United States under the Federal Tort Claims Act arises only on the conditions there stated and only for specific acts of negligence or wrongful conduct by a specific and identified employee of the United States acting within the scope of his employment;

23. That no employee of the United States was negligent or engaged in any wrongful conduct within the scope of his employment, or at all, in connection with the 1948 Columbia River flood fight, and nothing done or not done by any employee of the United States was the proximate cause of any damage to plaintiff;

24. That if any agency of government was responsible for the safety of plaintiff and his property and the safety of the persons and property of other residents of Vanport the agencies of government so responsible were the State of Oregon, the County of Multnomah and Peninsula Drainage District No.1;

25. That the plaintiff was himself chiefly and finally responsible for the safety of his person and property during the 1948 high water period;

26. That each of the contentions of the plaintiff is contrary to fact and to law;

27. That each motion, request, or demand heretofore made by the United States which was not granted should have been granted;

28. That each defense set forth in the answer of the United States is a valid defense to plaintiff's alleged claim;

b. *As to each plaintiff:*

29. That plaintiff assumed all risks, if any, arising out of the 1948 high water situation;

30. That if any negligence or wrongful conduct caused damage to plaintiff, it was the negligence or wrongful conduct of plaintiff himself;

31. That plaintiff received no advice from the United States, its agencies or employees;

32. That plaintiff did not rely on the advice, if any, received from the United States, its agencies or employees;

33. That no advice received by plaintiff from the United States, its agencies or employees, was the proximate cause of any damage to plaintiff;

34. That plaintiff in failing to evacuate his property from Vanport came to an independent conclusion as to the safety of his property and in reaching that conclusion considered and relied upon his own investigation and upon advice received from family members, friends and sources other than the United States or its agencies or employees;

35. That plaintiff failed to use due care in salvaging or attempting to salvage his property after Vanport was flooded;

36. That plaintiff received as a gift substantial relief assistance from the American National Red Cross and other sources;

c. *As to the Corps of Engineers:*

37. That Congress has imposed no duty on the Corps of Engineers and the Corps of Engineers has no duty to take any action whatever to protect or warn the public during a high water period;

38. That the Corps of Engineers is in no way responsible for the safety of persons or property during a high water period;

39. That the Corps of Engineers neither had or assumed any duty to plaintiff in connection with the 1948 high water situation;

40. That the Corps of Engineers gave no advice to plaintiff;

41. That the Corps of Engineers neither managed, directed or controlled the 1948 flood fight in the Vanport area;

42. That the Corps of Engineers neither managed, maintained or controlled any of the embankments protecting Vanport in May, 1948;

43. That the activity of the Corps of Engineers during the 1948 high water situation was confined to alerting the drainage districts along the Columbia River concerning the rising water and to providing, to the extent requested and within the limits of available personnel, technical advice and assistance to the persons actually and actively engaged in the 1948 Columbia River flood fight;

44. That all advice and assistance given by the Corps of Engineers during the 1948 high water situation was honest and competent advice and assistance given in the exercise of due care;

45. That neither the Corps of Engineers nor any employee of the Corps of Engineers was negligent or engaged in any wrongful conduct during the 1948 high water period;

46. That all activity of the Corps of Engineers and its employees during the 1948 high water period was discretionary activity for which no liability exists under the Federal Tort Claims Act;

47. That no act or failure to act of the Corps of Engineers or any employee of the Corps of Engineers was the proximate cause of any damage to plaintiff;

48. That neither the Corps of Engineers nor its employees had any duty imposed by Congress or by law to alert the drainage districts along the Columbia River concerning the rising water, to provide technical advice and assistance to the persons actually and actively engaged in the 1948 Columbia River flood fight, or to participate in any way in that flood fight;

49. That the United States cannot be held liable in damages for the negligence or wrongful conduct, if any, of the Corps of Engineers or its employees in the course of any activities undertaken by them which were beyond the scope of their duties as defined by Congress;

d. *As to the Housing Authority of Portland;*

50. That the Housing Authority of Portland is not a federal agency within the meaning of the Federal Tort Claims Act;

51. That the employees of the Housing Authority of Portland are not federal employees within the meaning of that act;

52. That the United States is not liable in damages for the negligence or wrongful conduct, if any, of the Housing Authority of Portland or its officers or employees;

53. That the relation between the United States and the Housing Authority of Portland in May, 1948, was that of lessor and lessee;

54. That the relation of lessor and lessee between the United States and the Housing Authority of Portland as defined by the master lease may not be impeached by extrinsic evidence;

55. That the Housing Authority of Portland was in no way responsible for the safety of plaintiff or his property or the safety of the persons or property of other residents of Vanport during the 1948 high water period;

56. That the Housing Authority of Portland had no duty to take any action to protect or warn the residents of Vanport during the 1948 highwater period;

57. That the Housing Authority of Portland neither managed, directed or controlled the 1948 flood fight in the Vanport area;

58. That the Housing Authority of Portland neither managed, maintained or controlled or was responsible for any of the embankments protecting Vanport in May, 1948;

59. That the Housing Authority of Portland had no duty to order the evacuation of Vanport;

60. That the Housing Authority of Portland had no power to order the evacuation of Vanport;

61. That the activity of the Housing Authority of Portland during the 1948 high water situation was confined to providing assistance in the flood fight;

62. That the activity of the Housing Authority of Portland and its officers and employees during the 1948 high water situation was voluntary activity in a period of possible public peril for which no liability in damages does or can arise;

63. That neither the Housing Authority of Portland nor any of its employees was negligent or engaged in any wrongful conduct during the 1948 high water period;

64. That the negligence or wrongful conduct, if any, of any employee of the Housing Authority of Portland during the 1948 high water period was beyond the scope of the employment of that employee;

65. That all advice and assistance given or provided by the Housing Authority of Portland or any employee of the Housing Authority of Portland during the 1948 high water period was honest and competent advice and assistance given in the exercise of due care;

66. That all activity of the Housing Authority of Portland and its employees during the 1948 high water period was discretionary activity for which no liability exists under the Federal Tort Claims Act;

67. That no act or failure to act of the Housing Authority of Portland or any employee of the Housing Authority of Portland was the proximate cause of any damage to plaintiff;

68. That the duties of the Housing Authority of Portland as landlord to plaintiff as tenant were confined to the actual premises occupied by plaintiff;

69. That there was no breach of duty of the Housing Authority of Portland as landlord to plaintiff as tenant.

e. *As to Executive Order 9957*:

70. That neither by the provisions of the executive order nor by the action taken pursuant to it did the Spokane, Portland & Seattle Railway Company or its subsidiaries or the Union Pacific Railroad Company become federal agencies within the meaning of the Federal Tort Claims Act;

71. That neither by the provisions of the executive order nor by the action taken pursuant to it did the employees of the railroad companies become employees of the United States within the meaning of the Federal Tort Claims Act;

72. That neither by the provisions of the executive order or by the action taken pursuant to it did the United States, its agencies or employees, come under any legal duty or obligation of any kind to plaintiff;

73. That neither by the provisions of the executive order nor by the action taken pursuant to it did the United States, its agencies or employees become obligated to maintain the western embankment protecting Vanport in a careful manner or at all;

74. That neither by the provisions of the executive order nor by the action taken pursuant to it did the United States, its agencies or employees, become responsible for the safety of plaintiff or his property or the safety of persons or property at Vanport;

75. That neither the United States nor any agency or employee of the United States acting pursuant to or in consequence of the executive order was negligent or engaged in any wrongful conduct during the 1948 high water period;

76. That at all times during the 1948 high water period the western embankment protecting Vanport was patrolled, maintained and operated with due care;

77. That all activity of the United States and its agencies and employees under and pursuant to the executive order was discretionary activity for which no liability exists under the Federal Tort Claims Act;

78. That no act or failure to act of the United States or any agency or employee of the United States acting pursuant to or as a consequence of the executive order was the proximate cause of any damage to plaintiff.

f. *As to the ownership of Vanport:*

79. That neither the United States nor its agencies or employees had any duty to plaintiff in connection with the 1948 high water situation by reason of the fact that the United States owned the premises occupied by plaintiff;

80. That all duties, if any, of the United States, its agencies and employees, as owner of the premises occupied by plaintiff, were duties relating to and confined to those premises;

81. That there was no breach of any duty owing to plaintiff from the United States as owner of the premises occupied by plaintiff;

82. That the breach of duty, if any, of the United States as owner of Vanport was not a breach of duty giving rise to liability under the Federal Tort Claims Act;

83. That the breach of duty, if any, of the United States as owner of Vanport was not the proximate cause of any damage to plaintiff;

84. That the United States did not by acquiring title to or owning Vanport or by any act of the Corps of Engineers or by any act of any agency or employee of the United States adopt or in any way become responsible for the western embankment at Vanport.

g. *As to Regulations 208:*

85. That the obligations, if any, imposed by Regulations 208 were imposed on Peninsula Drainage District No. 1 and not upon the United States, the Corps of Engineers or any agency or employee of the United States.

86. That the obligations, if any, imposed by Regulations 208 did not in any way relate to the western embankment at Vanport.

87. That neither the United States, the Corps of Engineers nor any agency or employee of the United States had any duty or obligation whatever in connection with Regulations 208.

88. That neither the United States, the Corps of Engineers nor any agency or employee of the United States had any duty or power to enforce the obligations, if any, created by Regulations 208.

89. That the obligations, if any, created by Regulations 208 were not created in favor of the plaintiff and that no breach, if any, of the obligations, if any, created by Regulations 208 would or could vest any rights in plaintiff.

90. That there was no negligence, unlawful conduct or breach of duty by the United States, the Corps of Engineers or any agency or employee of the United States in connection with Regulations 208 at Peninsula Drainage District No. 1 at the time of or at any time prior to the 1948 Columbia River high water.

91. That no negligence, unlawful conduct or breach of duty arising out of or in connection with Regulations 208 was the proximate cause of any damage to plaintiff.

92. That all activity of the United States, the Corps of Engineers and the agencies and employees of the United States in connection with Regulations 208 is discretionary activity for which there can be no liability under the Federal Tort Claims Act.

h. *As to liability for Opinions and advice:*

93. That the United States cannot be held liable in damages for opinions and advice expressed or offered by its agencies or employees, even though that opinion or advice was negligent or wrongful.

### The Issues to be Determined

F. The following issues of fact and mixed questions of law and fact, are to be determined with respect to each of the consolidated cases:

a. *In General*:

1. Was there a housing shortage in and around Portland, Oregon and Vancouver, Washington at all times material to this controversy?

2. Were the railroad fills bounding Vanport on the west built in a flood plain over an arm of Smith Lake?

3. Were the railroad fills constructed for railroad purposes and not as water repellent structures?

4. Did said railroad fills contain rotten timbers offering accelerated seepage paths during periods of high water material to this controversy?

5. Did said railroad fills have soft bottoms likely to blow out during periods of high water?

6. Did said railroad fills, when used as water repellent structures, constitute a continuing nuisance giving rise to causes of action upon the occurrence of damage?

7. During the period from 1934 through 1941, did United States, acting through the Corps of Engineers, accept and adopt said railroad fills as water repellent structures when improving Peninsula Drainage District No. 1?

8. Did United States again accept and adopt said railroad fills as water repellent structures when selecting the site for Vanport in 1942?

9. By virtue of Executive Order No. 9957, dated May 10, 1948, did the United States acquire exclusive possession and control of said railroad fills?

10. Did the United States, under said Executive Order, take over the operation and management of the Spokane, Portland & Seattle Railway Company, its subsidiaries, and the Union Pacific Railroad Company?

11. During the flood period of May, 1948 and for many years prior thereto, were trees, brush, briars, vines and high grass permitted to grow along the Vanport side of said railroad fills to the extent of preventing visual inspection of seepage spots, boils, saturated areas and subsidence of said railroad fills during periods of high water?

12. Did Peninsula Drainage District No. 1, under Title 33, Navigation and Navigable Waters, Chapter 2, Corps of Engineers Regulations, Part 208, have the obligation of removing any trees, brush, briars, vines and high grass along the Vanport side of said railroad fills under the supervision of the Corps of Engineers?

13. Did the Corps of Engineers of the Portland, Oregon District have the obligation to enforce said regulations but negligently failed to do so with the result that during the high water period of May, 1948, visual inspection of seepage spots, boils, saturated areas and subsidence of said railroad fills could not be made?

14. [Reiterates Issue of Fact No. 13.]

15. Were inspections required to be made under said regulations immediately prior to the beginning of each flood season by said Drainage District with the assistance of the Corps of Engineers in the Portland, Oregon District to determine whether or not any dangerous conditions existed in the levees, dikes or structures forming a part of said Drainage District?

16. [Reiterates Issue of Fact No. 13.]

17. Were the levees protecting Vanport and said railroad fills required to be patrolled continuously to locate possible boils or unusual saturated areas on the landward slopes to be certain there was no indication of conditions which might endanger said structures during the flood period of May, 1948?

18. [Reiterates Issue of Fact No. 13.]

19. Were appropriate advance measures required to be taken under said regulations to assure the availability of adequate labor and materials to meet all contingencies in the flood fight?

20. Did the Corps of Engineers negligently fail to enforce said regulations in that regard?

21. Did the United States own 80% of the land in Peninsula Drainage District No. 1 during the flood period of May, 1948?

22. Did the United States, acting through Federal Public Housing authority, buy the pump house, pumps and discharge lines, together with all electrical equipment in connection therewith, formerly used by Peninsula Drainage District No. 1, in the maintenance of said District by agreement dated April 29, 1944, and if so, was the United States responsible for the operation thereof during the flood period of May, 1948?

23. Was the entire management of Vanport regulated by a Manual of Policy and Procedure issued by Federal Housing Authority officials to Housing Authority of Portland?

24. Was said Manual of Policy and Procedure continuously supplemented by written instructions, releases and verbal orders by Federal Public Housing officials?

25. Was Housing Authority of Portland a Federal Agency in the management and control of Vanport within the meaning of the Federal Tort Claims Act?

26. Did Housing Authority of Portland act at all material times in an official capacity for the United States in the operation, management and control of Vanport?

27. [Reiterates Issue of Fact No. 26.]

28. Were plaintiffs and each of them tenants of the United States?

29. Was it the duty of the United States, as landlord, to warn plaintiffs of any latent defects in the premises during the flood period of May, 1948?

30. Were plaintiffs and each of them inexperienced with respect to floods?

31. Did plaintiffs, and each of them rely on statements with respect to their safety and the safety of their property made by the personnel of the Corps of Engineers?

32. Did plaintiffs, and each of them, rely on statements with respect to their safety and the safety of their property made by the personnel of the Housing Authority of Portland?

33. Did plaintiffs, or any of them, assume the responsibility or risk of deciding that they were either safe or unsafe during the flood period?

34. Was the 1948 Columbia River flood fight at Vanport directed or controlled by the United States, its agencies or employees?

35. Did the United States, its agencies or employees, have authority to order the evacuation of Vanport?

36. Did the United States, its agencies or employees, owe any duty to warn plaintiffs about flood conditions or to advise plaintiffs as to the safety of their persons or property?

37. Did the United States, its agencies or employees, undertake to warn plaintiffs about flood conditions or to advise plaintiffs as to the safety of their persons or property?

38. Did the United States, its agencies and employees, exercise due care in all matters arising out of or in any way connected with the 1948 high water situation?

39. Was any act or failure to act of the United States or its agencies or employees the proximate cause of any damage to plaintiffs?

40. If and to the extent any agency or employee of the United States undertook to direct or control the flood fight at Vanport or to be responsible for the condition of the embankments surrounding Vanport or to assume any duty to plaintiffs during the 1948 high water period or to advise plaintiffs as to the safety of their persons or property, did it or he act beyond the scope of its or his employment?

41. Were the State of Oregon, the County of Multnomah and Peninsula Drainage District No. 1 responsible for the safety of plaintiffs and their property at Vanport?

42. Were the plaintiffs themselves chiefly and finally responsible for the safety of their persons and property during the 1948 high water period?

390

b. *As to Each Plaintiff*:

43. [Reiterates Issue of Fact No. 37.]

44. [Reiterates Issues of Fact No. 31, 32.]

45. Was any advice received by plaintiff from the United States, its agencies or employees, the proximate cause of any damage to plaintiff:

46. In failing to evacuate his property from Vanport, did plaintiff come to an independent conclusion as to the safety of his property and in reaching that conclusion consider and rely upon his own investigation and upon advice received from family members, friends and sources other than the United States or its agencies or employees?

47. Was plaintiff himself negligent in remaining at Vanport and, if so, did such negligence cause his damage?

48. Was plaintiff himself negligent in failing to attempt to salvage his property after the flood and, if so, did such negligence cause his damage?

c. *As to the Corps of Engineers*:

49. Was the United States negligent, acting by and through the Corps of Engineers in either, any or all of the following respects:

a. In failing to protect the lives and property of plaintiffs?

b. In failing to collect, evaluate and disseminate among the forces of the office of the District Engineer, Portland, Oregon, all available flood information?

c. In failing to warn plaintiffs of danger to their lives and property by flood?

d. In failing and neglecting to co-operate with the American Red Cross and agencies of the State of Oregon in the evacuation of plaintiffs?

e. In failing to adequately and continuously patrol the railroad fill that failed?

f. In failing to enforce the then existing regulations of the Department of the Army requiring Peninsula Drainage District No. 1 to adequately patrol said railroad fill?

g. In releasing to plaintiffs or any of them, false and misleading information with respect to dangers to their lives and property by flood?

h. In failing to have available in the office or on the staff of the District Engineers, Portland, Oregon, any personnel familiar with the construction, defects in and weakness of, if any, the railroad fill that failed on and prior to the flood period of May, 1948?

i. In failing and neglecting to carry out specific orders, if any, of the Division Engineer of the North Pacific Division to patrol said railroad fill during the flood period?

j. In advising Housing Authority of Portland and Peninsula Drainage District No. 1 that there was no necessity for patroling said railroad fill?

k. In failing to have available in the Portland, Oregon district, adequate and experienced personnel sufficient to enforce Department of the Army regulations with respect to the maintenance, care and operation of Peninsula Drainage District No. 1 immediately prior to the flood period of May, 1948?

l. In failing to have available in the Portland, Oregon District adequate and experienced personnel sufficient to carry out the duty of collecting, evaluating and disseminating all available flood information and of warning plaintiffs of danger to their lives and property and of assisting in their evacuation.

50. Did the Corps of Engineers either have or assume any duty to plaintiffs in connection with the 1948 high water situation?

51. Did the Corps of Engineers give any advice to plaintiffs?

52. Did the Corps of Engineers either manage, direct, or control the 1948 flood fight in the Vanport area?

53. Did the Corps of Engineers either manage, maintain or control any of the embankments protecting Vanport in May, 1948?

54. Was the activity of the Corps of Engineers during the 1948 high water situation confined to alerting the drainage districts along the Columbia River concerning the rising water and to providing, to the extent requested and within the limits of available personnel, technical advice and assistance to the persons actually and actively engaged in the 1948 Columbia River flood fight?

55. Was all advice and assistance given by the Corps of Engineers during the 1948 high water situation honest and competent advice and assistance given in the exercise of due care?

56. Was all activity of the Corps of Engineers and its employees during the 1948 high water period discretionary activity for which no liability exists under the Federal Tort Claims Act?

57. Was any act or failure to act of the Corps of Engineers or any employee of the Corps of Engineers the proximate cause of any damage to plaintiff?

d. *As to Housing Authority of Portland*:

58. Was the United States acting through Housing Authority of Portland, and if so, was it negligent in either, any or all of the following respects:

a. In failing to warn plaintiffs of latent defects in the premises?

b. In failing to formulate and carry out a plan of evacuation of plaintiffs?

c. In advising plaintiffs that dikes were safe on May 29 and 30, 1948 and advising plaintiffs they would be warned if necessary, and informing plaintiffs they would have time to leave, and in instructing plaintiffs to not get excited, by written bulletin.

d. Did Housing Authority of Portland know, or should it have known, in the exercise of reasonable care, that the flood situation was becoming worse at the time it circulated said bulletin to plaintiffs?

e. In failing at about noon on May 30, 1948, when advised that the flood situation was critical, in not warning plaintiffs to immediately leave Vanport?

f. In failing to employ experienced personnel in flood control work and not patroling the diked areas surrounding Vanport, and particularly the railroad fill that failed?

g. In failing to clear the Vanport side of said railroad fill of trees, brush, shrubs, briars and tall grass immediately prior to or during the flood period so that visual inspection could be made of saturated areas, seepage spots, boils and subsidence?

h. In failing to cooperate with the American Red Cross, agencies of the State of Oregon, and Corps of Engineers in the flood fight.

i. In failing to collect and disseminate to the Corps of Engineers evidence of seepage, boils, saturated areas and subsidence of said railroad fill?

j. In failing and neglecting to continuously patrol the Vanport side or toe of said railroad fill, despite instructions so to do by the Corps of Engineers?

k. In arbitrarily withholding vital information with respect to danger to Vanport by flood from plaintiffs, although plaintiffs continuously sought such information?

59. [Reiterates Issue of Fact No. 25.]

60. Were the employees of Housing Authority of Portland employees of the United States within the meaning of the Tort Claims Act?

61. Is the United States liable in damages for the negligence or wrongful conduct, if any, of the Housing Authority of Portland or its officers or employees?

62. Was the relation between the United States and the Housing Authority of Portland in May, 1948, that of lessor and lessee?

63. Was the so-called master lease between the United States and Housing Authority of Portland modified by written or oral communications between the parties?

64. Did the Housing Authority of Portland manage, direct or control the 1948 flood fight in the Vanport area?

65. Was the conduct of Housing Authority of Portland during the flood period ratified by the United States?

392

66. Did the Housing Authority of Portland either manage, maintain or control or become responsible for any of the embankments protecting Vanport in May, 1948?

67. Was the activity of the Housing Authority of Portland during the 1948 high water situation confined to providing assistance in the flood fight?

68. Was the activity of the Housing Authority of Portland and its officers and employees during the 1948 high water situation voluntary activity in a period of possible public peril for which no liability in damages does or can arise?

69. Was either the Housing Authority of Portland or any of its employees negligent or guilty of any wrongful conduct during the 1948 high water period?

70. Was all advice and assistance given or provided by the Housing Authority of Portland or any employee of the Housing Authority of Portland during the 1948 high water period honest and competent advice and assistance given in the exercise of due care?

71. Was all activity of the Housing Authority of Portland and its employees during the 1948 high water period discretionary activity for which no liability exists under the Federal Tort Claims Act?

72. Was any act or failure to act of the Housing Authority of Portland or any employee of the Housing Authority of Portland the proximate cause of any damage to plaintiffs?

73. Was there any breach of duty of the Housing Authority of Portland as landlord to plaintiffs as tenants?

74. Did the Housing Authority of Portland owe any duty to plaintiffs except with relation to the apartments occupied by plaintiffs?

e. *As to the Railroad Companies, or Executive Order No. 9957:*

75. Did a large crack appear about sixty feet in length on the Vanport shoulder of the railroad fill that failed on or about the 28th day of May, 1948, and was it observed by personnel of the Spokane, Portland & Seattle Railway Company?

76. If so, was said crack evidence of subsidence of said railroad fill an indication of danger?

77. Did said railroad fill show evidence of saturation with water and was almost constant maintenance work required to keep the tracks level and the switches in order for several days prior to May 1948?

78. Was a slow order placed in effect reducing the speed of trains to about ten miles per hour when crossing said railroad fill on May 30, 1948?

79. If so, was said slow order necessary by reason of the saturated and dangerous condition of said railroad fill?

80. Was the United States negligent in acting through the Department of the Army in charge of the operation of the Spokane, Portland & Seattle Railway Company in not reporting any or all of such observations to the Corps of Engineers, Housing Authority of Portland, or to plaintiffs?

81. Was the knowledge of the personnel of the Spokane, Portland & Seattle Railway Company the knowledge of the United States as respects the foregoing conditions immediately prior to the failure of said railroad fill?

82. Did the negligence, or omissions of duty of the respective employees of the United States, as hereinabove claimed in the contentions of plaintiffs combine to proximately cause the losses and damages suffered by plaintiffs?

83. Did plaintiffs fail to remove their property from Vanport because of the negligence, omissions of duty or wrongful acts of the United States, as claimed in the contentions, any or all of them, of plaintiffs?

84. Either by the provisions of the executive order or by the action taken pursuant to it, did the Spokane, Portland & Seattle Railway Company or its subsidiaries or the Union Pacific Railroad Company become federal agencies within the meaning of the Federal Tort Claims Act?

85. Either by the provisions of the executive order or by the action taken pur-

suant to it, did the employees of the railroad companies become employees of the United States within the meaning of the Federal Tort Claims Act?

86. Either by the provisions of the executive order or by the action taken pursuant to it, did the United States, its agencies or employees, become obligated to maintain the western embankment protecting Vanport in a careful manner or at all?

87. Either by the provisions of the executive order or by the action taken pursuant to it did the United States, its agencies or employees, become responsible for the safety of plaintiff or his property or the safety of persons or property at Vanport.

88. Was the United States or any agency or employee of the United States, acting pursuant to or in consequence of the executive order negligent or guilty of any wrongful conduct during the 1948 high water period?

89. At all times during the 1948 high water period, was the western embankment protecting Vanport patroled and maintained with due care?

90. Was all activity of the United States and its agencies and employees under and pursuant to the executive order discretionary activity for which no liability exists under the Federal Tort Claims Act?

91. Was any act or failure to act of the United States or any agency or employee of the United States acting pursuant to or as a consequence of the executive order the proximate cause of any damage to plaintiffs?

92. Was the over-all flood situation at Vanport dangerous immediately prior to May 30, 1948?

## Issues Of Law To Be Determined

G. The following issues of law are to be determined with respect to each of the consolidated cases:

a. *In General*:

1. Do the amended complaints state claims against the United States upon which relief can be granted?

2. Does the Court have jurisdiction of these actions?

3. Has Section 702c, Title 33 U.S.C.A been superseded by the Federal Tort Claims Act?

4. Does Section 702c, Title 33 U.S.C.A have application to these actions?

5. Under the provisions of 33 U.S.C.A. 702c, can the United States be held liable to plaintiffs for damage caused by flood waters?

6. Was all damage to plaintiffs caused by an Act of God for which neither the United States nor its agencies or employees is in any way responsible and for which the United States cannot be held liable?

7. If Vanport was a War Housing Project, as distinguished from a low rent or slum clearance project, was there any authority delegated by the Congress to create the relationship of independent contractor or lessor by and between the United States and Housing Authority of Portland?

8. Does the doctrine of res ipsa loquitur apply in these cases?

9. Did the railroad fills, when used as water repellent structures constitute a continuing nuisance giving rise to causes of action upon the occurrence of damage?

10. Did the United States, during the period from 1934 through 1941, acting through the Corps of Engineers, accept and adopt said railroad fills as water repellent structures when improving Peninsula Drainage District No. 1?

11. Did the United States accept and adopt said railroad fills as water repellent structures when selecting the site for Vanport in 1942?

12. Did United States, acting through the Department of the Army, acquire exclusive possession and control of said railroad fills under Executive Order No. 9957, dated May 10, 1948?

13. Did Peninsula Drainage District No. 1 have the obligation, under Corps of Engineers' regulations, Title 33, Navigation and Navigable waters, Chapter 2, Part 208, of removing trees, brush, briars, vines

and high grass from the embankments surrounding Vanport, including said railroad fill?

14. Did the Corps of Engineers for the Portland, Oregon District, have the obligation to enforce said regulations?

15. Did the obligations, if any, imposed by said regulations, relate to the western embankment at Vanport?

16. Did the Corps of Engineers of the Portland, Oregon District negligently fail to enforce said regulations?

17. Did the Corps of Engineers or the United States have power to enforce said regulations?

18. Did the obligations, if any, created by said regulations operate in favor of the plaintiffs?

19. Did the Corps of Engineers of the Portland, Oregon District have the duty and responsibility of assisting Peninsula Drainage District No. 1 in carrying out said regulations?

20. Did the Corps of Engineers negligently and carelessly fail to enforce said regulations immediately prior to the flood season of May, 1948?

21. Did the Corps of Engineers negligently fail to enforce said regulations with respect to taking advance measures to assure the availability of adequate labor and materials to meet all contingencies in the flood fight of May, 1948?

22. Was the failure, if any, to abide by or enforce said regulations the proximate cause of any damage to plaintiffs?

23. Was all activity of the United States, its agencies and employees, in connection with said regulations discretionary activity for which there can be no liability under the Federal Tort Claims Act?

24. Was Housing Authority of Portland organized under an enabling act of the Oregon State Legislature for the purpose, among other things, of becoming an agent of the United States in the management of Housing Projects including Vanport?

25. Was the master lease between Housing Authority of Portland and United States a property management agreement only, under the terms of which the United States was principal and Housing Authority of Portland agent?

26. [Reiterates Issue of Fact No. 63.]

27. [Reiterates Issue of Fact No. 25.]

28. Did Housing Authority of Portland act, at all material times, in an official capacity for the United States in the operation, management and control of Vanport?

29. During the flood period of May, 1948, did Housing Authority of Portland act in an official capacity for and on behalf of the United States in the flood fight?

30. Was the conduct of Housing Authority of Portland during the flood period ratified by the United States?

31. Were plaintiffs tenants of the United States?

32. Does the law of Oregon applicable to the relationship of landlord and tenant apply between plaintiffs and the United States?

33. Was it the duty of the United States as such landlord to warn plaintiffs of latent defects in the premises during the flood period of May, 1948?

34. Was it the duty of the United States to give plaintiffs timely warning of danger to their lives and property by flood on and before May 30, 1948?

35. [Reiterates Issue of Fact No. 33.]

36. Did the United States, its agencies or employees, have any duty to order the evacuation of Vanport?

37. [Reiterates Issue of Fact No. 36.]

38. Can the United States be held liable in damages for the negligence or wrongful conduct, if any, of its agencies or employees who attempt to provide assistance to the public in a period of possible public peril?

39. Was all activity of the United States and its agencies and employees in connection with the 1948 Columbia River high water discretionary activity for which

there can be no liability under the Federal Tort Claims Act?

40. Can the United States be held liable in damages for opinions or advice expressed by its officers or employees, even if that advice is negligent or wrongful?

41. Should the motions of the United States to dismiss these actions have been granted?

42. Should the motions of the United States for leave to serve and file a third-party complaint have been granted?

43. Is each defense set forth in the answer of the United States a valid defense to plaintiffs' alleged claims?

b. *As to Each Plaintiff*:

44. [Reiterates Issue of Fact No. 45.]

45. Did plaintiff assume all risk, if any, arising out of the 1948 high water situation?

46. [Reiterates Issue of Fact No. 47.]

47. [Reiterates Issue of Fact No. 48.]

c. *As to the Corps of Engineers*:

48. Has Congress imposed any duty on the Corps on Engineers and does the Corps of Engineers have any duty to take any action whatever to protect or warn the public during a high water period?

49. Was the Corps of Engineers in any way responsible for the safety of plaintiffs and their property during the 1948 high water period?

50. [Reiterates Issue of Fact No. 50.]

51. [Reiterates Issue of Fact No. 56.]

52. [Reiterates Issue of Fact No. 57.]

53. Did either the Corps of Engineers or its employees have any duty imposed by Congress or by law to alert the drainage districts along the Columbia River concerning the rising water, to provide technical advice and assistance to the persons actually .and actively engaged in the 1948 Columbia River flood fight, or to participate in any way in that flood fight?

54. Can the United States be held liable in damages for the negligence or wrongful conduct, if any, of the Corps of Engineers or its employees in the course of any activities undertaken by them which were be-

yond the scope of their duties as defined by Congress?

55. [Reiterates Issue of Fact No. 49.]

d. *As to Housing Authority of Portland:*

56. [Reiterates Issue of Fact No. 58.]

57. [Reiterates Issue of Fact No. 59.]

58. [Reiterates Issue of Fact No. 60.]

59. [Reiterates Issue of Fact No. 61.]

60. [Reiterates Issue of Fact No. 62.]

61. Was the Housing Authority of Portland in any way responsible for the safety of plaintiff or his property or the safety of the persons or property of other residents of Vanport during the 1948 high water period?

62. Did the Housing Authority of Portland have any duty to take any action to protect or warn the residents of Vanport during the 1948 high water period?

63. [Reiterates Issue of Fact No. 64.]

64. Did the Housing Authority of Portland either manage, maintain or control or become responsible for any of the embankments protecting Vanport in May, 1948?

65. Did the Housing Authority of Portland have any duty to order the evacuation of Vanport?

66. Did the Housing Authority of Portland have any power to order the evacuation of Vanport?

67. [Reiterates Issue of Fact No. 68.]

68. Was the negligence of wrongful conduct, if any, of any employee of the Housing Authority of Portland during the 1948 high water period beyond the scope of the employment of that employee?

69. [Reiterates Issue of Fact No. 70.]

70. [Reiterates Issue of Fact No. 71.]

71. [Reiterates Issue of Fact No. 73.]

72. Is the breach of duty, if any, of the United States as owner of Vanport a breach of duty for which there can be recovery in these actions?

e. *As to the Railroad Company, or Executive Order No. 9957:*

73. [Reiterates Issue of Fact No. 80.]

74. [Reiterates Issue of Fact No. 81.]

75. [Reiterates Issue of Fact No. 82.]

76. [Reiterates Issue of Fact No. 83.]

77. [Reiterates Issue of Fact No. 84.]
78. [Reiterates Issue of Fact No. 85.]
79. [Reiterates Issue of Fact No. 86.]
80. [Reiterates Issue of Fact No. 87.]
81. [Reiterates Issue of Fact No. 88.]
82. [Reiterates Issue of Fact No. 89.]
83. [Reiterates Issue of Fact No. 90.]
84. [Reiterates Issue of Fact No. 91].
85. Does liability under the Federal Tort Claims Act arise only for specific acts of negligence or wrongful conduct by a specific employee of the United States acting within the scope of his employment?

86. Did the plaintiffs or any of them suffer loss or damage because of the negligence, omissions of duty or wrongful acts of the United States?

87. Are plaintiffs entitled to recover from the United States the damages they sustained?

88. Does the activity of the Red Cross in providing relief during the flood period affect the right, if any, of plaintiffs to recover?

89. What damages, if any, did each, any, or all of the following plaintiffs sustain?

| Name | Civil No. | Amount of Loss |
| --- | --- | --- |
| Clark, Solon B. Jr. and Geraldine A. Clark, Husband and Wife v. U.S.A. | 4420 | $———— |
| LaVigne, Paul L. v. U.S.A. | 4449 | $———— |
| Lebkisher, C. W. and Virginia v. U.S.A. | 4450 | $———— |
| Lommasson, Vern W. and Irene v. U.S.A. | 4451 | $———— |
| Merz, Robert N. and Dolores C. v. U.S.A. | 4468 | $———— |
| Miller, Herschel J. and Lorene v. U.S.A. | 4469 | $———— |
| Manning, Levi and Olive v. U.S.A. | 4599 | $———— |
| Thomas, James D. and Phisford O. Thomas v. U.S.A. | 4607 | $———— |
| Schook, Donald L. and Dorothy Schook, Husband and Wife v. U.S.A. | 4775 | $———— |
| Marlett, Howard H. and Vera Marlett, Husband and Wife v. U.S.A. | 4785 | $———— |
| Litchfield, Ella G. v. U.S.A. | 4882 | $———— |
| Smith, Walter D. and Dolores M. Smith, Husband and Wife v. U.S.A. | 4928 | $———— |
| Schroeder, Herbert Henry and Katherine Starr Schroeder, Husband and Wife v. U.S.A. | 5054 | $———— |
| Ambrose, Marguerite and LeRoy J. Ambrose, Husband and Wife v. U.S.A. | 5122 | $———— |
| Bird, Paul H. and Mary A. Bird, Husband and Wife v. U.S.A. | 5469 | $———— |
| Elliott, John T. and Ethel J. Elliott, Husband and Wife v. U.S.A. | 5475 | $———— |
| Jones, Milton L. and Barbara J. Jones, Husband and Wife v. U.S.A. | 5484 | $———— |
| Wild, Stanley M. and Iva M. Wild, Husband and Wife v. U.S.A. | 5498 | $———— |
| Wilkinson, Howard E. and Eleanor Wilkinson, Husband and Wife v. U.S.A. | 5499 | $———— |
| Caswell, James Grant and Thelma K. Caswell, Husband and Wife v. U.S.A. | 5532 | $———— |

90. If the flood situation at Vanport immediately prior to May 30, 1948, was generally dangerous, did that fact impose a duty on the United States to warn or advise plaintiffs accordingly?

91. Did the United States, assuming it had no legal obligations to warn plaintiffs of danger to their lives and property, if any, assume such legal obligation, and thereafter fail to discharge such duty to plaintiffs?

The classification of issues in this order between issues of fact and issues of law is only for convenience. It does not affect the rights of the parties.

H. The following documents and other material have been marked as pre-trial exhibits. It is agreed that each pre-trial exhibit is what it purports to be and that no further authentication of any pre-trial exhibit will be required. It is also agreed that no objection will be offered on the ground that the original instrument is not produced. All objections on grounds of relevancy or materiality are reserved and all objections relating to competency on grounds other than authenticity are similarly reserved, including among other things the hearsay objection. The deposition exhibits shall be used on the terms and to the extent provided by the Federal Rules of Civil Procedure.

### Plaintiffs' Exhibits

| No. | Description |
|---|---|
| 1 | Topographic Map prepared by Geological Survey, U. S. Department of Interior (Marked upon John H. Suttle Deposition). |
| 2 | Heald's New Authentic Map of the City of Portland, corrected to Jan. 25, 1913. (Marked upon John H. Suttle Deposition). |
| 3 | Statement entitled "Report of Charles H. Reagan, 1948 Columbia River Flood Fight, Peninsula Drainage District No. 1, Multnomah County, Oregon," signed by Charles H. Reagan. |
| 4 | Statement entitled "1948 Flood Flight, Peninsula Drainage Districts Nos. 1 and 2," dated May 29, signed W. R. Donham. |
| 5 | Statement entitled "Statement of Harry K. Doyle, Engineer in charge of Field Supervision of the Flood Control Districts of the Columbia River Basin," signed Harry K. Doyle. |
| 6 | Statement entitled "Statement by Seth F. Michael, Engineer in charge of the Portland area," signed by Seth F. Michael. |
| 7 | Statement entitled: "Data for Telegraphic Report to O.C.E. re: Peninsula Drainage District No. 1," dated May 31, 1948, prepared by Kenneth R. Dibblee and unsigned. |
| 8 | Memorandum entitled "Report of Inspection of High Water Conditions from the Sandy Drainage District at Troutdale to and including Deer Island on the Columbia River," dated May 26, 1948, and signed Harry K. Doyle. |
| 9 | Telegraphic message entitled "Flood Report" from District Engineer of Portland, Oregon, to Chief of Engineers, Washington, D. C. |
| 10 | Telegraphic message entitled "Flood Report" from the District Engineer of Portland, Oregon, to Chief of Engineers, Washington, D. C. |
| 11 | Copy of "Urgent Telegram" addressed to the Chief of Engineers dated May 31, 1948, and signed "Weaver, Division Engineer." |
| 12 | Report entitled "Completion Report 1948 Columbia River Flood Fight, Peninsula District No. 1, Multnomah County, Oregon," prepared by Kenneth R. Dibblee. |
| 12-A | Corps of Engineers Drawing CLW-106-1/1A. |
| 13 | Report of entitled "Completion Report 1948 Columbia River Flood Fight, Peninsula Drainage District No. 2, Multnomah County, Oregon," prepared by Kenneth R. Dibblee. |

Plaintiffs' Exhibits

| No. | Description |
|---|---|
| 13–A | Corps of Engineers Drawing CLW–107–3/1. |
| 13–B | Corps of Engineers Drawing CLW–107–3/2. |
| 13–C | Corps of Engineers Drawing CLW–107–3/3. |
| 13–D | Corps of Engineers Drawing CLW–107–3/4. |
| 13–E | Corps of Engineers Drawing CLW–107–3/5. |
| 13–F | Corps of Engineers Drawing CLW–107–3/6. |
| 13–G | Corps of Engineers Drawing CLW–107–3/7. |
| 13–H | Corps of Engineers Drawing CLW–107–4/3. |
| 14 | Series of tabulations entitled "Columbia River Basin Daily Stage and Precipitation Report." |
| 15 | Resolution adopted September 25, 1939, by the Board of Supervisors of Peninsula Drainage District No. 1, Multnomah County, Oregon. |
| 16 | Report Entitled "Flood Control Report on Columbia River, Washington and Oregon," dated April 30, 1935. |
| 17 | Report entitled "Columbia River and Tributaries, Washington and Oregon," dated 25 January 1936. |
| 18 | Report entitled "Preliminary Examination for Flood Control of Columbia River, Washington and Oregon," dated October 5, 1937. |
| 19 | Project Report for Peninsula Drainage District No. 1, dated February 23, 1937. |
| 20 | Revised Project Report dated April 25, 1940. |
| 20–A | Corps of Engineers Drawing CLW–106–2/1. |
| 20–B | Sheet headed "Cross Reference". |
| 20–C | Corps of Engineers Drawing, Plate 14–5. |
| 21 | Memorandum from C. R. Moore to The Division Engineer, dated April 25, 1940. |

| No. | Description |
|---|---|
| 22 | Supplemental Memorandum from John C. H. Lee to The Division Engineer, dated May 2, 1940. |
| 23 | Memorandum addressed to General Robins, dated June 5, 1940. |
| 24 | Communication from Miles Reber to Division Engineer, dated June 5, 1940. |
| 25 | Telegram from Schley to Col. Lee, dated June 5, 1940. |
| 26 | Memorandum from C. R. Moore to District Engineer, dated June 8, 1940. |
| 27 | Communication from John C. H. Lee to Division Engineer, dated June 8, 1940. |
| 28 | Communication from Miles Reber to Division Engineer, dated June 14, 1940. |
| 28–A | Document dated October 3, 1940. |
| 29 | Letter from C. R. Moore to Board of Supervisors, Peninsula Drainage District No. 1, dated September 15, 1941. |
| 30 | Letter from Ralph A. Tudor to Board of Supervisors, Peninsula Drainage District No. 1, dated December 28, 1944. |
| 31 | Copy of lease between Federal Government and Housing Authority of Portland. |
| 32 | Aerial photograph showing break in fill. |
| 33 | Aerial photograph looking northwest through break in fill. |
| 34 | Photograph bearing number 518, Vanport looking north into failure of fill. |
| 35 | Aerial photograph bearing number 961, Columbia River, Mile 106, looking downstream. |
| 36 | Agreement dated April 29, 1944 between United States and Peninsula Drainage District #1. |
| 37 | Picture Story of Northwest Flood. |
| 38 | Floods of May-June, 1948, Columbia River Basin, Geological Survey Water-Supply Paper 1080. |

Plaintiffs' Exhibits

| No. | Description | No. | Description |
|---|---|---|---|
| 38a | Map accompanying report. | 61 | Press release May 30, 1948 (deposition exhibit WA–13). |
| 39 | Report dated June 28, 1948 (deposition exhibit S–2). | 62 | Memorandum dated May 30, 1948 (deposition exhibit WA–14). |
| 40 | Report dated June 11, 1948 (deposition exhibit S–3). | 63 | Memorandum dated May 31, 1948 (deposition exhibit WA–15). |
| 41 | Series of telegrams (deposition exhibit S–5). | 64 | Flood emergency manual, Portland, Oregon District (deposition exhibit WA–17). |
| 42 | Telegram May 11, 1948 (deposition exhibit S–7). | 65 | Teletype to Chief of Engineers (deposition exhibit WA–18). |
| 43 | Telegram dated July 10, 1940 (deposition exhibit S–12). | 66 | Teletype of Chief of Engineers (deposition exhibit WA–19). |
| 44 | Telegram (deposition exhibit S–17). | 67 | Teletype to Chief of Engineers (deposition exhibit WA–20). |
| 45 | Telegram (deposition exhibit S–18). | | |
| 46 | Letter dated July 10, 1948 (deposition exhibit S–19). | 68 | Teletype to Chief of Engineers (deposition exhibit WA–21). |
| 47 | Telegram (deposition exhibit S–23). | 69 | Teletype to Chief of Engineers (deposition exhibit WA–22). |
| 48 | Telegram (deposition exhibit S–24). | | |
| 49 | Letter dated May 11, 1948 (deposition exhibit S–25). | 70 | Teletype to Chief of Engineers (deposition exhibit WA–23). |
| 50 | Letter dated May 11, 1948 (deposition exhibit S–26). | 71 | Teletype to Chief of Engineers (deposition exhibit WA–24). |
| 51 | Series of telegrams from May 12 to May 30, 1948 (deposition exhibit S–27). | 72 | Teletype to Chief of Engineers (deposition exhibit WA–25). |
| 52 | Log dated May 29, 1948 by S. F. Michael (deposition exhibit WA–1). | 73 | Teletype to Chief of Engineers (deposition exhibit WA–26). |
| 53 | Memorandum dated May 24, 1948 by T. W. Tagsdale (deposition exhibit WA–2). | 74 | Telegram to Adj. General (deposition exhibit WA–27). |
| 54 | Memorandum dated May 27, 1948 by T. W. Tagsdale (deposition exhibit WA–3). | 75 | Note dated May 13, 1948 (deposition exhibit MD–12). |
| 55 | News letter dated May 28, 1948 (deposition exhibit WA–4). | 76 | Pass Book No. 214 (deposition exhibit MD–3). |
| 56 | Memorandum dated May 28, 1948 (deposition exhibit WA–6). | 77 | Newspaper clipping (deposition exhibit MD–4). |
| 57 | Memorandum dated May 29, 1948 (deposition exhibit WA–8). | 78 | Newspaper clipping dated May 29, 1948 (MD–5). |
| 58 | Memorandum dated May 29, 1948 (deposition exhibit WA–9). | 79 | Affidavit of Mary DeCoy (deposition exhibit MD–6). |
| 59 | Teletype flood report (deposition exhibit WA–10). | 80 | Minutes of Housing Authority of Portland (deposition exhibit F–17). |
| 60 | Telephone report to O.C.E. dated May 30, 1948 (deposition exhibit WA–12). | 81 | Summary of Portland Housing Authority, Advances and Repayments deposition exhibit F–38). |
| | | 82 | Statement of Operation of lease projects only (deposition exhibit F–39). |

Plaintiffs' Exhibits

No.               Description

83 Liability insurance policy (deposition exhibit F–45).

84 Comprehensive Theft insurance policy (deposition exhibit F–48).

85 Index to Manual of Policy and Procedure (deposition exhibit F–87).

86 Manual of Policy and Procedure, Vol. I (deposition exhibit F–84A).

87 Manual of Policy and Procedure, Vol. II (deposition exhibit F–84B).

88 Refinancing Contract dated Aug. 3, 1948 (deposition exhibit F–80).

89 Use Permit (deposition exhibit H–2).

90 Use Permit (deposition exhibit H–3).

91 Use Permit (deposition exhibit H–4).

92 Soil Conservation Bulletin dated May 1, 1948 (deposition exhibit F–131).

93 Sec. 4110:1 et seq. Manual of Policy and Procedure (deposition exhibit F–85).

94 Section 4110:1 et seq. Manual of Policy and Procedure (F–86).

95 Section 2114:1 et seq. Manual of Policy and Procedure (deposition exhibit F–88).

96 Section 4110 et seq. Manual of Policy and Procedure (deposition exhibit F–89).

97 Section 4110:3 et seq. Manual of Policy and Procedure (deposition exhibit F–90).

98 Section 4040:1 et seq. Manual of Policy and Procedure (deposition exhibit F–91).

99 Section 4040:3 et seq. Manual of Policy and Procedure (deposition exhibit F–92).

100 Property Survey Action (deposition exhibit F–93).

101 Four-page letter dated November 28, 1947 from Harry B. Mitchell to Hon. Dillon S. Myer (deposition exhibit F–94).

102 Section 4820:5 et seq. Manual of Policy and Procedure (deposition exhibit F–95)

No.               Description

103 Section 3831:1 et seq. Manual of Policy and Procedure (deposition exhibit F–96).

104 Section 3805:4 et seq. Manual of Policy and Procedure (deposition exhibit F–97).

105 Section 4658:1 et seq. Manual of Policy and Procedure (deposition exhibit F–98).

106 Section 4650:1 et seq. Manual of Policy and Procedure (deposition exhibit F–99).

107 Regional Supplement to Manual of Policy and Procedure (deposition exhibit F–100).

108 Section 4650:6 et seq. Manual of Policy and Procedure (deposition exhibit F–101).

109 Regional Supplement to Manual of Policy and Procedure (deposition exit F–102).

110 Section 4646:1 et seq. Manual of Policy and Procedure (deposition exhibit F–103).

111 Section 3646:8 et seq. Manual of Policy and Procedure (deposition exhibit F–104).

112 Exhibit to same (deposition exhibit F–105).

113 Section 4644:6 et seq. Manual of Policy and Procedure (deposition exhibit F–106).

114 Regional Supplement to Manual of Policy and Procedure (deposition exhibit F–107).

115 Regional Supplement to Manual of Policy and Procedure (deposition exhibit F–108).

116 Section 3635:5 et seq. Manual of Policy and Procedure (deposition exhibit F–108A).

117 Section 4634:1 Manual of Policy and Procedure (deposition exhibit F–109).

118 Section 3632:1 et seq. Manual of Policy and Procedure (deposition exhibit F–110).

Plaintiffs' Exhibits

No.            Description

119  Section 4621:1 et seq. Manual of Policy and Procedure (deposition exhibit F–111).

120  Section 4621:2 et seq. Manual of Policy and Procedure (deposition exhibit F–112).

121  Section 4621:6 et seq. Manual of Policy and Procedure (deposition exhibit F–113).

122  Section 3655:4 et seq. Manual of Policy and Procedure (deposition exhibit F–114).

123  Section 4614:4 et seq. Manual of Policy and Procedure (deposition exhibit F–115).

124  Section 4614:14 et seq. Manual of Policy and Procedure (deposition exhibit F–116).

125  Temporary Regional Circular & Supplements, Manual of Policy and Procedure (deposition exhibit F–117).

126  Regional Supplement, Manual of Policy and Procedure (deposition exhibit F–118).

127  Regional Supplement, Manual of Policy and Procedure (deposition exhibit F–119).

128  Section 4138:1 et seq. Manual of Policy and Procedure (deposition exhibit F–120).

129  Regional Supplement, Manual of Policy and Procedure (deposition exhibit F–121).

130  Section 4138:7 et seq. Manual of Policy and Procedure (deposition exhibit F–122).

131  Section 4135:5 et seq. Manual of Policy and Procedure (deposition exhibit F–123).

132  Section 4135:3 et seq. Manual of Policy and Procedure (deposition exhibit F–124).

133  Section 4135:6 et seq. Manual of Policy and Procedure (deposition exhibit F–125).

No.            Description

134  Transmittal No. 102, Manual of Policy and Procedure (deposition exhibit F–126).

135  Regional Supplement, Manual of Policy and Procedure (deposition exhibit F–127).

136  Section 4150:2 et seq. Manual of Policy and Procedure (deposition exhibit F–128).

137  Transmittal Bulletin No. 63, re paint brushes (deposition exhibit F–129).

138  Regional Supplement re mechanical refrigerators (deposition exhibit F–130).

139  Regional Supplement, Manual of Policy and Procedure (deposition exhibit F–133).

140  Notes of Colonel Theron Weaver re May, 1948 flood.

141  Concluding pages numbers 17 to 20 inclusive of plaintiffs' exhibit 13.

142  Concluding pages numbers 23 to 26 inclusive of plaintiffs' exhibit 12.

143  Cross Section Map dated February 14, 1908 (deposition exhibit T–5).

144  Cross Section Map, Trestle for Smith Lake (deposition exhibit T–4).

145  Petition for Condemnation, Civil No. 1604, United States District Court for the District of Oregon.

146  Deposition of Colonel Orville E. Walsh.

147  Deposition of Robert E. Hickson.

148  Deposition of Seth F. Michael.

149  Deposition of Harry K. Doyle.

150  Deposition of Kenneth R. Dibblee.

151  Deposition of E. B. Stanton.

152  Deposition of Carl F. Thomas.

153  Deposition of Earnest Bradley.

154  Deposition of E. H. Showalter.

155  Deposition of Harvey Jackson.

156  Deposition of N. S. Westergaard.

157  Deposition of Frederick Kinser.

158  Deposition of Harold Martinsen.

Plaintiffs' Exhibits

| No. | Description |
| --- | --- |
| 159 | Deposition of George Cunningham. |
| 160 | Deposition of Paul Williams. |
| 161 | Deposition of Merle E. Barbee. |
| 162 | Deposition of C. L. McKinney. |
| 163 | Deposition of Harry D. Freeman. |
| 164 | Deposition of Harry D. Jaeger. |
| 165 | Deposition of Roy W. Taylor. |
| 166 | Deposition of Ernest E. Milliron. |
| 167 | Deposition of Carl W. Tomlinson. |
| 168 | Deposition of Ralph B. Schlatter. |
| 169 | Deposition of C. W. McGill. |
| 170 | Deposition of John L. Ward. |
| 171 | Deposition of Jack Weber. |
| 172 | Deposition of Mary De Coy. |
| 173 | Deposition of Donald Morey. |
| 174 | Deposition of John C. Mahan. |
| 175 | Deposition of Wayne R. Mayberry. |
| 176 | Deposition of Levi Manning. |
| 177 | Deposition of Frances J. Miller. |
| 178 | Deposition of Roy E. Miller. |
| 179 | Deposition of Caroline L. Miller. |
| 180 | Deposition of Howard Marlett. |
| 181 | Deposition of Virginia Lebkisher. |
| 182 | Deposition of Charles William Lebkisher. |
| 183 | Deposition of Paul L. LaVigne. |
| 184 | Deposition of Ella Litchfield. |
| 185 | Deposition of Robert N. Merz. |
| 186 | Deposition of J. C. Strudgeon. |
| 187 | Deposition of Mildred Lindstrom. |
| 188 | Deposition of Arnold E. Pendell. |
| 189 | Deposition of James D. Thomas. |
| 190 | Deposition of Herbert Schroeder. |
| 191 | Deposition of Jack C. Strudgeon. |
| 192 | Deposition of Lorene Miller. |
| 193 | Deposition of Wallace A. Pearce. |
| 194 | Deposition of J. E. Warner. |
| 195 | Deposition of Lela Warner. |
| 196 | Deposition of Vern W. Lommasson. |

| No. | Description |
| --- | --- |
| 197 | Deposition of Edward A. Valentine. |
| 198 | Deposition of John H. Suttle. |
| 199 | Deposition of Robert N. Madaris. |
| 200 | Deposition of Mearl C. Tillman. |
| 201 | Deposition of Martin T. Pratt. |
| 202 | (Number reserved for Schaffran deposition). |
| 203 | Letter dated May 24, 1949, to Arthur L. Malain from Col. O. E. Walsh. |
| 204 | Letter dated May 24, 1949, to Arthur L. Malain from Abner D. Silverman. |
| 205 | Oregon Journal, first page, March 3, 1950. |

Defendant's Exhibits

| No. | Description |
| --- | --- |
| 1 | Map of Vanport area. |
| 2 | Map of Peninsula Drainage District No. 1. |
| 3 | Map of Peninsula Drainage District No. 2. |
| 4 | Aerial photograph of the Vanport area after the failure of the western embankment. |
| 5 | Plan of the Western embankment. |
| 6 | Sheet of cross sections of the western embankment. |
| 7 | Sheet of cross sections of embankments at Peninsula Drainage Districts Nos. 1 and 2. |
| 8 | Sheet comparing the size of the Western embankment and the northern levee. |
| 9 | Sheet comparing the size of the western embankment and the southern levee. |
| 10 | Sheet comparing the size of the western embankment and the Denver Avenue embankment. |
| 11 | Sheet comparing the size of the western embankment and the Union Pacific RR embankment. |
| 12 | Sheet comparing the size of the western embankment and the S. P. & S. Ry. Co. embankment. |

Defendant's Exhibits

| No. | Description |
|-----|-------------|
| 13 | Sheet comparing the size of the western embankment and the northern levee of Peninsula Drainage District No. 2. |
| 14 | Cross section of the western embankment showing water elevation in prior years. |
| 15 | Map of Vanport. |
| 16 | Map of Vanport showing western limits of occupied or available housing as of May 30, 1948. |
| 17 | Map of Peninsula Drainage District No. 1 showing the limits of government ownership as of May 30, 1948. |
| 18 | Four photographs of piling in western embankment after the failure of that embankment. |
| 19 | Opinion of the Court in Abdalla v. Housing Authority of Portland, No. 155–797 in the Circuit Court of the State of Oregon for the County of Multnomah. |
| 20 | The complaint in Banks v. Housing Authority of Portland, et al., No. 184309 in the Circuit Court of the State of Oregon for the County of Multnomah. |
| 21 | The amended and supplemental complaint in Banks v. Housing Authority of Portland et al. |
| 22 | The opinion dated March 22, 1949, in Banks v. Housing Authority of Portland, et al. |
| 23 | Organization papers of Peninsula Drainage District No. 1. |
| 24 | Resolution of Peninsula Drainage District No. 1 dated September 25, 1939. |
| 25 | Revised project report of Corps of Engineers dated April 25, 1940. |
| 26 | Letter from Acting District Engineer to Board of Supervisors Peninsula Drainage District No. 1 dated May 28, 1941. |
| 27 | Letter from the District Engineer to Peninsula Drainage District No. 1 dated September 15, 1941. |
| 28 | Letter from the District Engineer to Peninsula Drainage District No. 1 dated December 29, 1944. |
| 29 | Letter from the District Engineer to Peninsula Drainage District No. 1 dated January 3, 1945. |
| 30 | Regulations, Title 33, Chapter II, Part 208. |
| 31 | Letter from the District Engineer to Mr. A. A. Tims dated May 26, 1948. |
| 32 | Letter from A. A. Tims to the District Engineer dated May 28, 1948. |
| 33 | News release from the Corps of Engineers dated May 28, 1948. |
| 34 | News release from the Corps of Engineers dated May 29, 1948. |
| 35 | News release from the Corps of Engineers dated May 30, 1948. |
| 36 | Contract between S. P. & S. Ry. Co. and A. R. Potter dated October 3, 1906. |
| 37 | Contract between S. P. & S. Ry. Co. and Grant Smith dated October 3, 1906. |
| 38 | Profile dated June 30, 1916, S. P. & S. Ry. Co. |
| 39 | Letter agreement between Peninsula Industrial Company and S. P. & S. Ry. Co. dated January 15, 1917. |
| 40 | Letter agreement between Peninsula Industrial Company and S. P. & S. Ry. Co. dated January 16, 1917. |
| 41 | Agreement between S. P. & S. Ry. Co. and Northern Pacific Railway Company and others dated January 29, 1917. |
| 42 | Agreement between S. P. & S. Ry. Co. and Grant Smith and Company dated October 17, 1917. |
| 43 | Right of Way and Track Map S. P. & S. Ry. Co. June 30, 1916. |

404

Defendant's Exhibits

No.     Description

44   Contract between Oregon & Washington Railroad Company annd Robert Wakefield dated February 19, 1908.

45   Contract between Oregon & Washington Railroad Company and Pacific Bridge Company and Robert Wakefield dated July 8, 1909.

46   O. & W. R. R. Co. sketch dated May 14, 1908.

47   Organization papers of HAP.

48   Amendment to HAP by-laws.

49   Lease between U.S.A. and HAP dated October 15, 1942.

50   Lease between U.S.A. and HAP dated April 12, 1943.

51   Master lease between U.S.A. and HAP dated February 17, 1944.

52   Amendment No. 1 to master lease.

53   Amendment No. 2 to master lease.

54   Amendment No. 5 to master lease.

55   Amendment No. 6 to master lease.

56   Amendment No. 7 to master lease.

57   Master management resolution No. 154.

58   FPHA release No. 4615:1.

59   Annual contributions contract between HAP and U.S.A. dated February 7, 1942.

60.   Administration fund agreement dated February 17, 1944.

61   HAP budget for fiscal year, July 1, 1947 to June 30, 1948.

62   Report entitled "From Roses to Rivets."

63   Memorandum dated May 28, 1948, relating to flood expenses.

64   Notice to the residents of Vanport.

65   HAP Resolution No. 204.

66   HAP Resolution No. 216.

67   HAP Resolution No. 279.

68   HAP Resolution No. 286.

69   HAP Resolution No. 339.

70   HAP Resolution No. 391.

No.     Description

71   HAP Resolution No. 412.

72   HAP Resolution No. 431A.

73   HAP Resolution No. 458.

74   HAP memorandum dated September 8, 1942.

75   Letter from Robert J. Flood to HAP dated January 1, 1943.

76   NHA General Order 60-1.

77   Memorandum signed by Joseph A. Nance dated January 21, 1943.

78   Letter from Robert J. Flood to HAP dated August 13, 1943.

79   Memorandum addressed to Jessie Epstein dated September 19, 1945.

80   Interoffice memorandum HAP dated October 15, 1945.

81   Interoffice memorandum HAP dated October 24, 1945.

82   Letter from Ellis Ash to HAP dated August 1, 1946.

83   Letter from Roger Spalding to HAP dated June 25, 1946.

84   Contract for financial assistance between HAP and FPHA dated March 16, 1943.

85   Amendment to contract for financial assistance.

86   Revised form of use permit, HAP-216.

87   Application for family dwelling, HAP No. 221.

88   Index of HAP resolutions.

89   Agreement of mutual assistance between Portland and HAP.

90   HAP form of application for employment.

91   HAP form entitled "Payroll Account."

92   Report of Vanport flood dated June 1, 1948.

93   Handbook for residents at Vanport.

94   Letter from Robert J. Flood to HAP dated January 19, 1944.

95   HAP form 216.

96   Letter to tenants of Vanport concerning new lease form.

Defendant's Exhibits

| No. | Description |
|---|---|
| 97 | HAP form 217. |
| 98 | Memorandum to Mr. Egan dated November 8, 1948. |
| 99 | Memorandum to Mr. Bailey dated November 18, 1948. |
| 100 | Contract dated April 1, 1947, between HAP and Portland Building Trades Council. |
| 101 | Amendment to this contract dated August 19, 1948. |
| 102 | Contract between HAP and Building Service Employees International Union Local No. 49 dated April 1, 1947. |
| 103 | Contract between HAP and Upholsterers' International Union, Local No. 65, dated April 1, 1947. |
| 104 | Contract between HAP and International Association of Machinists dated April 1, 1947. |
| 105 | Notes of meeting held at Red Cross Headquarters Saturday, May 29, 1948. |
| 106 | Red Cross report entitled "Vanport City Flood." |
| 107 | Red Cross publication entitled "When Disaster Strikes." |
| 108 | Report of Jack A. Hayes entitled "Vanport Flood Disaster." |
| 109 | 1947 Oregon Disaster Plan. |
| 110 | Declaration of state of limited emergency by the governor of Oregon dated May 30, 1948. |
| 111 | Notice signed by Kenneth C. Royall. |
| 112 | General Order No. 1. |
| 113 | General Order No. 2. |
| 114 | General Order No. 3. |
| 115 | General Order No. 4. |
| 116 | Order of Secretary of the Army dated July 9, 1948. |
| 117 | The May 24, 1948, issue of the Oregon Journal pages 1 and 8. |
| 118 | The May 25, 1948, issue of the Oregon Journal, page 1. |
| 119 | The May 26, 1948, issue of the Oregon Journal, pages 1, 13 and 18. |
| 120 | The May 27, 1948, issue of the Oregon Journal, pages 1 and 2. |
| 121 | The May 28, 1948, issue of the Oregon Journal, pages 1 and 21. |
| 122 | The May 29, 1948, issue of the Oregon Journal, pages 1, 2 and 3. |
| 123 | The May 30, 1948, issue of the Oregon Journal, pages 1, A10, A11 and 12A. |
| 124 | The May 23, 1948, issue of the Oregonian, page 1. |
| 125 | The May 24, 1948, issue of the Oregonian, page 1. |
| 126 | The May 25, 1948, issue of the Oregonian, pages 1 and 4, |
| 127 | The May 26, 1948, issue of the Oregonian, pages 1 and 17. |
| 128 | The May 27, 1948, issue of the Oregonian, pages 1, 24 and 12 (second section). |
| 129 | The May 28, 1948, issue of the Oregonian, pages 1 and 24 (second section). |
| 130 | The May 29, 1948, issue of the Oregonian, pages 1, 3 and editorial page. |
| 131 | The May 30, 1948, issue of the Oregonian, pages 1, 14, 15, 16, 22. |

In so far as this order applies to cases other than the cases consolidated for the purpose of trial and listed in Schedule A it shall not have the effect of precluding the defendant from making in such cases a motion for leave to file and serve a third-party complaint similar to the motion for that purpose heretofore made in Civil No. 4420. If any such motion is granted, the necessary revisions and additions may be made in this pre-trial order.

## Conclusion

This pre-trial order has been formulated after conferences at which the litigants and their respective attorneys have appeared in court. This order will control the course of the trial and shall not be amended except by consent of the parties and the Court, or by order of the Court to prevent manifest injustice.

406

## Schedule A

| Name | Civil No. |
|------|-----------|
| Clark, Solon B. Jr. and Geraldine A. Clark, Husband and Wife v. U.S.A. | 4420 |
| La Vigne, Paul L. v. U.S.A. | 4449 |
| Lebkisher, C. W. and Virginia v. U.S.A. | 4450 |
| Lommasson, Vern W. and Irene v. U.S.A. | 4451 |
| Merz, Robert N. and Dolores C. v. U.S.A. | 4468 |
| Miller, Herschel J. and Lorene v. U.S.A. | 4469 |
| Manning, Levi and Olive Manning v. U.S.A. | 4599 |
| Thomas, James D. and Phisford O. Thomas v. U.S.A. | 4607 |
| Schook, Donald L. and Dorothy Schook, Husband and Wife v. U.S.A. | 4775 |
| Marlett, Howard N. and Vera Marlett, Husband and Wife v. U.S.A. | 4785 |
| Litchfield, Ella v. U.S.A. | 4882 |
| Smith, Walter D. and Dolores M. Smith, Husband and Wife v. U.S.A. | 4928 |
| Schroeder, Herbert Henry and Katherine Starr Schroeder, Husband and Wife v. U.S.A. | 5054 |
| Ambrose, Marguerite and LeRoy J. Ambrose, Wife and Husband v. U.S.A. | 5122 |
| Bird, Paul H. and Mary A. Bird, Husband and Wife v. U.S.A. | 5469 |
| Elliott, John T. and Ethel J. Elliott, Husband and Wife v. U.S.A. | 5475 |
| Jones, Milton L. and Barbara J. Jones, Husband and Wife v. U.S.A. | 5484 |
| Wild, Stanley M. and Iva M. Wild, Husband and Wife v. U.S.A. | 5498 |
| Wilkinson, Howard E. and Eleanor Wilkinson, Husband and Wife v. U.S.A. | 5499 |
| Caswell, James Grant and Thelma K. Caswell, Husband and Wife v. U.S.A. | 5532 |